2022 IL App (1st) 190691

FIRST DIVISION
July 18, 2022

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 20437 |
| | ) | |
| AARON SMITH, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Justice Walker concurred in the judgment and opinion.
Justice Coghlan specially concurred, with opinion.

**OPINION**

¶ 1    Following the denial of defendant Aaron Smith's motion to quash arrest and suppress

evidence, he was found guilty of murder and mob action and was sentenced to 20 years'

imprisonment. On appeal, he contends that the trial court erred in denying his motion to suppress,

because his arrest was the result of an "investigative alert" generated by Chicago police, rather

than a warrant from a neutral magistrate, in violation of the Illinois Constitution. On that basis, he

asserts that the fruits of the arrest must be suppressed and that he is entitled to a new trial. For the

following reasons, we find that defendant's warrantless arrest violated article I, section 6, of the

Illinois Constitution. Ill. Const. 1970, art. I, § 6. However, the admission of evidence stemming from the arrest was harmless beyond a reasonable doubt because the other evidence of guilt was overwhelming. Thus, notwithstanding the illegal use of an investigative alert to arrest him, we affirm defendant's conviction and sentence.

¶ 2                                           BACKGROUND

¶ 3     Defendant was charged with five counts of first degree murder and two counts of mob action in connection with the beating and death of Anthony Morris.[1]

¶ 4     In March 2017, defendant's counsel filed a "motion to quash arrest and suppress evidence." Defendant argued, *inter alia*, that defendant's arrest violated article I, section 6, of the Illinois Constitution because it was premised on an "investigative alert," "[d]espite the fact that the Chicago Police officers had over 6 months to obtain an arrest warrant." Defendant sought to suppress "all the direct and indirect fruits of the arrest," including his postarrest statements to police.

¶ 5                                   Motion to Suppress Hearing

¶ 6     On April 28, 2017, the court conducted a hearing on defendant's motion to suppress. Detective David Garcia testified that on March 26, 2014, he was assigned to investigate the beating of Morris, who at that time was hospitalized in critical condition. Garcia went to the hospital. Although Garcia could not speak to Morris, he spoke to persons who identified themselves as friends of Morris, including Jatavia Lee and her boyfriend, Linell Lewis. Lee told Garcia that she

---

[1]Codefendant Tierra Williams was also charged in connection with Morris's death, but the charges against her were dismissed before defendant's trial.

and Lewis had been with Morris on the day of the beating, and she described the events preceding the incident.

¶ 7    Lee told Garcia that Morris had been looking for a source of marijuana. Lewis gave Morris the phone number of a person known as "Boo Man" from whom Lewis previously obtained marijuana. Morris set up a meeting point with Boo Man to purchase marijuana. Lee and Lewis waited nearby while Morris went to meet Boo Man. As they waited, Morris called them and indicated that he planned to steal marijuana from Boo Man. Lee saw Morris enter a vehicle. A short time later she saw Morris running away, followed by Boo Man and a woman. Those two individuals got into a car and chased Morris.

¶ 8    Lee told Garcia that she did not know the real name of Boo Man but that she could recognize him and knew where he lived. Garcia put together a photo array, from which Lee identified defendant as Boo Man.

¶ 9    Garcia testified that Morris died on April 3, 2014.

¶ 10   Garcia further testified that he was able to obtain surveillance video footage from a currency exchange and an apartment building near the site of the incident. Garcia indicated that the video showed a "transaction" involving Morris, defendant, and a female, during which defendant got into a vehicle. The footage then showed Morris "fleeing" from the vehicle with defendant and the female in pursuit. By viewing the video footage, Garcia noticed another potential witness, who was eventually identified as Tahesha Jackson. Jackson subsequently met with police, identified defendant in a photo array, and stated that she saw defendant hitting Morris on the head with a beer bottle as he lay on the ground.

¶ 11    After these identifications, Garcia issued an investigative alert for defendant on April 22, 2014. Garcia testified that an investigative alert is issued through a computer system known as the "CHRIS system." He agreed that "any detective" can use that system to issue an alert.

¶ 12    Garcia testified that he did not try to obtain an arrest warrant for defendant. Asked why not, he said "it is not common practice, actually." The following exchange ensued between Garcia and defendant's counsel:

"Q. Within the Chicago Police Department, it is not common practice to get an arrest warrant?

A. In a case like this, no, it is not.

Q. When you say a case like this, what do you mean?

A. Well, in this case I had no proof that [defendant] had fled the jurisdiction. That he wasn't in the area and couldn't be located.

Q. So, you only go to a magistrate for an arrest warrant if you think the offender has fled the jurisdiction?

A. Actually, we'll go to a State's Attorney for approval first. Unless you have proof they fled the jurisdiction, you are not going to get it.

Q. You are not going to get a warrant?

A. Correct."

¶ 13    Garcia testified that he interviewed defendant following his arrest in October 2014. After waiving his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), defendant admitted his involvement in Morris's beating.

¶ 14    Sergeant Chris Maraffino testified that as of October 21, 2014, he was assigned to the "Fugitive Apprehension Unit" of the Chicago Police Department and that his duties included finding people for whom investigative alerts had been issued. On that date, he arrested defendant pursuant to an investigative alert. Maraffino testified that he "knew what the investigative alert was for" but he otherwise lacked knowledge of the facts of the case.

¶ 15    Defendant was riding a bicycle when Maraffino found him. Maraffino did not see defendant commit any crimes or traffic violations. Maraffino transported defendant to "Area South" to be questioned by detectives. Maraffino agreed that he had no role in investigating the case and that his involvement was limited to arresting defendant.

¶ 16    In denying defendant's motion to suppress, the trial court stated: "Even though this particular Court abhors the investigative alerts and how the Chicago Police Department abuses them, I think the case law is clear that there is probable cause to support the arrest, even if the arrest was pursuant to [an] investigative alert." The court noted that defendant was identified as the person from whom Morris was going to purchase drugs and as the person who chased Morris.

¶ 17                                    Trial Evidence

¶ 18    At trial, Tiana Jones testified that Morris, her brother, lived in Tennessee. In March 2014, he visited family and friends in Chicago. Jones learned that something happened to Morris on March 26. She later visited him at the hospital, where he was unresponsive. He was taken off life support approximately one week later.

¶ 19    Lee testified that Morris was a friend of her boyfriend, Lewis. On March 26, 2014, Lewis and Morris discussed buying "weed," and Lewis suggested that they contact Boo Man. In court, Lee identified defendant as Boo Man.

¶ 20    Lee testified that Morris called defendant and they planned a meeting near 71st Street and Wentworth Avenue. Lewis drove Morris and Lee to the meeting point, where Morris left the car to go to a currency exchange. Lewis and Lee parked at a gas station and waited for Morris. Lee recalled that, as they waited, Morris called Lewis. Minutes later, she saw Morris run out of the currency exchange and into an alley. She heard someone say "he went that way" and saw defendant standing in the alley. Lee and Lewis pulled into traffic, but they were cut off by a "gold car" with three or four people inside. Lee and Lewis followed the gold car, which turned onto 70th Street and blocked one end of the alley. Lee and Lewis saw another car "blocking the other end of the alley."

¶ 21    Lee and Lewis could not enter the alley so they "kept circling around." As they did, Morris called and said he was "trapped." Lee and Lewis kept circling the block because the alley was "blocked off." Eventually, Lee saw an ambulance and paramedics "picking [Morris] up off the ground." Morris was "holding his head hollering and screaming."

¶ 22    The following day, Lee spoke to Garcia at the hospital and told him that "Boo Man" may be responsible. On March 29, she identified defendant in a photo array. Lee acknowledged that she did not see who had beaten Morris.

¶ 23    Similar to Lee's testimony, Lewis testified that he referred Morris to defendant, whom he knew as "Boo Man," to obtain marijuana. Lewis, Lee, and Morris drove to a gas station, where Morris left the car to meet defendant at a currency exchange. As Lee and Lewis were waiting, Morris called Lewis. Lewis then saw Morris run out of the currency exchange and down an alley. Lewis then saw a silver car pull up, and the defendant "hopped out the car and was looking."

Defendant was wearing an orange "Pelle Pelle" jacket, which Lewis had seen him wear before. Lewis also saw a young woman "hop out" of a gold car and heard her say "he went that way."

¶ 24     Lewis saw defendant run into the alley. As Lewis drove around the block, the gold car cut him off. Lewis followed the gold car, which stopped at the end of the alley. Lewis could not get into the alley because both ends were blocked by the silver car and the gold car. Lewis circled the block a number of times, looking for Morris. Lewis eventually saw an ambulance and Morris laying on the ground.

¶ 25     Lewis testified that on March 30, he identified defendant in a photo array. In court, he identified the photo array, as well as the jacket (People's Exhibit 3) that defendant wore on the day of Morris's beating.

¶ 26     During Lewis's testimony, the State published portions of video footage from inside the currency exchange (People's exhibit No. 2), and Lewis identified points where Morris was visible. Lewis was shown an aerial map of the area (People's exhibit No. 36) and indicated the locations of the gas station, the alley, where he saw defendant, and where he eventually found Morris.

¶ 27     Tahesha Jackson testified that on the afternoon of March 26, 2014, she was in the 7000 block of South Perry Avenue when she noticed cars "running back and forth through the alley." A short time later, she went outside and noticed a man "getting stumped [sic] and g[etting] hit in the head with [a] bottle." Jackson identified defendant as the man who stomped on and kicked Morris. She also testified that defendant hit Morris in the head with a bottle. Afterward, defendant approached her and asked "did I see the drugs that they had dropped." On April 7, 2014, Jackson identified defendant in a photo array.

¶ 28    Cheresse Jeffries testified that on March 26, 2014, she was in her apartment in the 7000 block of South Perry when her boyfriend told her that someone was fighting. Jeffries went to her back porch and saw Morris being chased by another man through an empty lot.[2] She identified defendant as the person who was chasing Morris. When defendant caught up to Morris, he grabbed his shirt and asked him "where his s*** was at." Defendant punched Morris in the face, and Morris fell to the ground.

¶ 29    Jeffries saw a silver car pull up with three women inside. The driver got out of the car, retrieved a bat from the trunk, and then hit Morris with the bat. The other two women kicked Morris in the leg, and defendant kicked Morris in the head. Defendant told the woman with the bat that "he got this," after which the three women got back into the car and left. Defendant picked up a brown object and struck Morris in the head with it. Defendant kicked Morris "one last time" and then left the scene. Jeffries called 911, and an ambulance arrived. Jeffries testified that she was about 35 feet away from the site of the beating. She saw other males nearby, but defendant was the only male who hit Morris.

¶ 30    Garcia testified that on March 27, 2014, he went to the hospital where Morris was on life support. Garcia spoke to Lee, who indicated she was with Morris shortly before the incident and that Morris went to meet someone she knew as Boo Man. Using information from Lee, Garcia put together a photo array including defendant. On March 29, Lee viewed the array and identified defendant as Boo Man. Garcia testified that other detectives talked to Lee's boyfriend, Lewis, who also identified defendant as Boo Man.

---

[2]Jeffries did not identify Morris by name, but it is undisputed that the person she saw being chased was Morris.

¶ 31    Garcia went to the area of the beating and viewed video footage from a currency exchange. Garcia testified that the video shows Morris entering the currency exchange and that defendant can be seen wearing the same jacket that he was wearing when he was arrested. Garcia obtained the video footage from the currency exchange (People's exhibit No. 2).

¶ 32    Garcia subsequently examined surveillance video footage from an apartment building in the 7000 block of South Perry. In that footage, he noticed a woman who appeared to be looking toward the site of the beating at the time of the incident. He learned from the apartment building's custodian that the woman was named Tahesha. Video footage from the building was admitted into evidence.

¶ 33    On April 7, 2014, Garcia and another detective interviewed Jackson, who identified defendant in a photo array. Jackson told detectives that defendant stomped the victim and hit him in the head with a bottle. On April 21, 2014, Garcia and another detective briefly interviewed Jeffries.

¶ 34    Garcia further testified that defendant was arrested on October 19, 2014, and brought to Area South. At the time of his arrest, defendant was wearing the same "Pelle Pelle" jacket that he wore in the currency exchange video footage. Garcia identified the jacket (People's exhibit No. 7) in court.

¶ 35    Garcia and Detective Brian Drees conducted a recorded interview of defendant in the early morning of October 20, 2014. A portion of the recording was marked as People's exhibit No. 8, admitted into evidence, and published to the jury. In the recording, defendant indicated that Morris robbed him and ran away. Defendant indicated that, by the time he found Morris, Morris had

already been beaten by a number of other people. Defendant stated that he may have hit Morris with his hands, but he did not remember hitting Morris with anything else.

¶ 36     Garcia testified that defendant was interviewed the same morning by Assistant State's Attorney (ASA) Eric Bashirian and Drees at 3:27 a.m. Garcia further testified that on the evening of October 20, 2014, Jeffries came to the police station and identified defendant in a lineup.

¶ 37     Drees testified that he and Garcia interviewed defendant at 1:12 a.m. on October 20, 2014, and that Drees and ASA Bashirian conducted a second videotaped interview at 3:24 a.m. A portion of the second interview (People's exhibit No. 58) was published in court.

¶ 38     In that recording, defendant said that Morris called him to buy marijuana and they agreed to meet on 71st Street near the currency exchange. Defendant was in a parked car with a female friend named Tierra. Morris walked up to their car and got into the back seat. Morris told defendant he wanted a "lot" of marijuana. Morris said he was going to the currency exchange to get money and left. When Morris returned, defendant handed Morris about one ounce of wrapped marijuana. Morris ran away with the marijuana without paying. Defendant told Tierra that they had been robbed, and they drove away, with Tierra driving.

¶ 39     A short time later, defendant exited the car and searched for Morris on foot. He came across a car with three women and a man who told defendant they had seen what happened; one of the women told him the direction in which Morris had run. Defendant jumped in the car, and they began to drive, looking for Morris. They came upon a group of people who were members of the Gangster Disciples, and defendant told them that he had been robbed. The Gangster Disciples agreed to help look for Morris. Eventually they pointed out Morris's location to defendant.

Defendant said that when he got to Morris, he was already beaten. He asked Morris "where my s*** at." When Morris said that it was gone, defendant hit him.

¶ 40    In the recording, defendant maintained that Morris was "already f*** up" by the time he got to him. Defendant stated that he only hit Morris twice with his fist. Defendant denied that he kicked or stomped Morris or that he hit him with a bottle.

¶ 41    On cross-examination, Drees agreed that defendant was arrested based on an investigative alert.

¶ 42    Detective Thomas Dineen testified that on April 7, 2014, he presented a photo array to Tahesha Jackson, who identified defendant and stated that defendant struck Morris with a bottle.

¶ 43    Detective Jeremy Morales testified that on March 30, 2014, he showed Lewis a photo array and Lewis identified defendant as "Boo Man." Morales also testified that on October 20, 2014, he showed Cheresse Jeffries a physical lineup, from which she picked out defendant as the person who struck Morris.

¶ 44    Dr. Ponni Arukumar, the chief medical examiner at the Cook County Medical Examiner's Office, testified that she reviewed the report from Morris's autopsy. Dr. Arukumar concluded that the cause of death was "cranial cerebral blunt force injury" and the manner of death was homicide.

¶ 45    The defense did not call any witnesses.

¶ 46    The jury found defendant guilty of all charged counts of murder and mob action. Defendant was sentenced to 20 years' imprisonment on the felony murder count (count III), and the remaining convictions were merged into count III.

¶ 47                                    ANALYSIS

¶ 48    On appeal, defendant raises a single claim: that his motion to suppress should have been granted because his arrest was based on an unsworn investigative alert issued upon a detective's determination of probable cause, rather than a determination of probable cause made by a magistrate and supported by an "affidavit." He claims that his arrest violated the Illinois Constitution's search and seizure clause, which provides that "[n]o warrant shall issue without probable cause, supported by affidavit ***." Ill. Const. 1970, art. I, § 6.

¶ 49    Defendant contends that "significant" evidence was obtained through his illegal arrest, namely his statements to police admitting that he hit Morris, the distinctive jacket he wore on the day of Morris's beating, and the postarrest lineup identification by Jeffries. He suggests that the State's case would have been much weaker without this evidence, and thus he asks that we reverse and remand for a new trial.

¶ 50    "In reviewing a ruling on a motion to quash arrest and suppress evidence, we apply a two-part standard of review. [Citation.] While we accord great deference to the trial court's factual findings, and will reverse those findings only if they are against the manifest weight of the evidence, we review *de novo* the court's ultimate ruling on a motion to suppress involving probable cause. [Citation.]" *People v. Grant*, 2013 IL 112734, ¶ 12. That is, while a "trial court's findings of historical fact are reviewed for clear error," a reviewing court "may assess the established facts in relation to the issues and may draw its own conclusion when deciding what relief, if any, should be granted." *People v. Harris*, 228 Ill. 2d 222, 230 (2008).

¶ 51    Defendant does not dispute any of the trial court's factual findings with respect to the motion to suppress. Rather, he claims that his warrantless arrest—premised on an investigative

alert issued approximately six months earlier—violates article I, section 6, of the Illinois Constitution, which provides:

> "The people shall have the right to be secure in their persons, houses, papers, and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. *No warrant shall issue without probable cause, supported by affidavit* particularly describing the place to be searched and the persons or things to be seized." (Emphasis added.) Ill. Const. 1970, art. I, § 6.

¶ 52 Notably, defendant does not dispute that probable cause existed for his arrest. Nor does he claim that his arrest violated the fourth amendment of the United States Constitution, which provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

Defendant's sole claim is that an arrest based on an investigative alert is unlawful because the Illinois Constitution requires "a determination of probable cause supported by an 'affidavit' and made by a neutral magistrate."

¶ 53    Defendant relies largely on this court's discussion of investigative alerts in *People v. Bass*, 2019 IL App (1st) 160640, *aff'd in part & vacated in part*, *People v. Bass*, 2021 IL 125434. Significantly, after the parties submitted their briefs in the instant appeal, our supreme court vacated (but did not overrule) the portions of this court's decision in *Bass* concerning investigative alerts. *Bass*, 2021 IL 125434, ¶ 31. Nonetheless, a review of *Bass* helps inform the principles at issue.

¶ 54                    The Appellate Court's *Bass* Decision

¶ 55    In *Bass*, Chicago police issued an investigative alert for the defendant after the complainant reported to police that he had molested her. *Bass*, 2019 IL App (1st) 160640, ¶ 7. The police did not obtain a warrant. *Id.* About three weeks later, police pulled over a vehicle, in which defendant was a passenger, for running a red light. *Id.* ¶ 8. Police ran a "name check" on the defendant and arrested him after discovering the investigative alert. *Id.* Defendant then gave an inculpatory statement to police. *Id.* ¶ 9. After defendant's motion to quash his arrest and suppress the statement was denied, he was convicted of criminal sexual assault. *Id.* ¶¶ 14, 19.

¶ 56    On appeal, defendant challenged the denial of his motion to suppress on two grounds: (1) that the traffic stop was "unlawfully extended" when the police ran a name check on defendant and (2) that the investigative alert was an "unconstitutional basis on which to arrest him." *Id.* ¶ 28.

¶ 57    Regarding his challenge based on the investigative alert, our court recognized that the fourth amendment "allows for warrantless arrests outside the home as long as the police have probable cause to arrest the suspect. [Citations.]" *Id.* ¶ 37. As the *Bass* defendant did not dispute that there was probable cause, his arrest did not violate the fourth amendment to the United States Constitution. *Id.*

¶ 58    Nevertheless, our court proceeded to hold that the arrest violated the Illinois Constitution. This court stated: "with regard to the necessity of a warrant issued by a neutral magistrate, historical precedent concludes that article I, section 6, provides greater protections than the fourth amendment. Indeed, arrests based solely on investigative alerts, even those supported by probable cause, are unconstitutional under the Illinois Constitution." *Id.* ¶ 43.

¶ 59    Our court's conclusion stemmed from the fact that the Illinois Constitution (since 1870) has specified that no warrant shall issue " 'without probable cause, supported by *affidavit.*' " (Emphasis in original.) *Id.* ¶ 49 (quoting Ill. Const. 1870, art. II, § 6). The *Bass* court found this phrase differed in a "critical respect" from the fourth amendment's language that no warrants shall issue " 'but upon probable cause, supported by *[o]ath or affirmation.*' " (Emphasis in original.) *Id.* (quoting U.S. Const., amend. IV). The court determined that the delegates to the 1870 Constitution "intentionally included the word 'affidavit.' " *Id.* ¶ 50.

¶ 60    This court in *Bass* proceeded to discuss Illinois Supreme Court cases applying the 1870 Constitution, which showed a "strong presumption against executive branch officers making their own probable cause determinations without swearing to facts before a magistrate." *Id.* ¶ 62. This court in *Bass* suggested that, since the drafters of the 1970 Constitution did not amend the "supported by affidavit" phrase, it could be presumed they accepted the supreme court case law interpreting it. *Id.* ¶¶ 64-65.

¶ 61    This court in *Bass* proceeded to find that an arrest is "unconstitutional when effectuated on the basis of an investigative alert issued by the Chicago Police Department." *Id.* ¶ 71. Separately, the court also agreed with defendant's alternative argument, that the traffic stop leading to his

arrest was unlawfully prolonged under fourth amendment precedent. *Id.* ¶¶ 73-78. This court thus held that defendant's postarrest statement was improperly admitted at trial. *Id.* ¶¶ 82-85.

¶ 62                    Our Supreme Court Vacates the *Bass* Analysis of Investigative Alerts

¶ 63    Upon the State's petition for leave to appeal, our supreme court agreed that the *Bass* defendant's motion to suppress should have been granted, but only because the traffic stop was "unreasonably extended" in violation of the fourth amendment. *Bass*, 2021 IL 125434, ¶ 26. Significantly, our supreme court declined to address the constitutionality of investigative alerts, reasoning that courts should not "decide moot or abstract questions" or render "advisory opinions" and "must avoid reaching constitutional issues unless necessary to decide a case. [Citations.]" *Id.* ¶¶ 29-30. Our supreme court vacated the corresponding portions of the appellate court's opinion. *Id.* ¶ 31.

¶ 64    Two supreme court justices—Chief Justice Burke and Justice Neville—dissented from the portion of the *Bass* opinion that vacated the appellate court's discussion of the constitutionality of investigative alerts. Justice Neville expressed his view that "the State's use of an investigative alert to justify defendant's warrantless arrest merits constitutional scrutiny." *Id.* ¶ 50 (Neville, J., concurring in part and dissenting in part). He noted that "*vacating* the appellate court's analysis deprives the Chicago Police Department of crucial authoritative guidance on the procedures to follow under the Illinois Constitution when making warrantless arrests." (Emphasis in original.) *Id.* ¶ 62. Justice Neville urged the supreme court to address the use of investigative alerts to fulfill its "role as the protector of the rights guaranteed by the warrant clause of the Illinois Constitution. [citation]." *Id.* ¶ 63.

¶ 65 We recognize that, even before the supreme court vacated the relevant portions of the appellate court opinion in *Bass*, a number of other panels of this court disagreed with *Bass*'s conclusion that investigative alerts were unconstitutional. See *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 37; *People v. Simmons*, 2020 IL App (1st) 170560; *People v. Thornton*, 2020 IL App (1st) 170753; *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 61-64. However, we are not bound by those decisions. See *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008) ("[T]he opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels. [Citation.]"). Thus, we proceed to our own analysis.

¶ 66 For the following reasons, we conclude that defendant's warrantless arrest was improper, as it was premised solely on an investigative alert issued *six months earlier*, meaning the police had ample opportunity to obtain an arrest warrant but did not do so. Further, as the arresting officer had no other reason to believe that defendant had committed a crime, there were no other circumstances to justify a warrantless arrest.

¶ 67 We note that, while our supreme court vacated our court's discussion of investigative alerts in *Bass*, the reasons for doing so are not present in this case. The *Bass* defendant made separate challenges to his arrest under the fourth amendment and the Illinois Constitution. Since the fourth amendment argument required reversal, our supreme court did not reach the constitutionality of investigative alerts under the Illinois Constitution to avoid deciding a "moot" question and rendering an advisory opinion. *Bass*, 2021 IL 125434, ¶¶ 29-31. By contrast, in this case, defendant's sole argument is that his arrest under an investigative alert violated article I, section 6, of the Illinois Constitution. Thus, a discussion of investigative alerts is necessary to decide defendant's appeal.

¶ 68    Significantly, defendant does not suggest that his arrest violated the fourth amendment to the United States Constitution, as the United States Supreme Court has concluded that the fourth amendment does *not* require police to obtain an arrest warrant from a judge. See *United States v. Watson*, 423 U.S. 411, 423 (1976). Rather, defendant's challenge turns on whether the "affidavit" clause of article I, section 6, of the Illinois Constitution generally requires a determination of probable cause by a neutral magistrate, rather than by a police officer. In turn, the question becomes whether the "affidavit" clause in the Illinois Constitution provides greater protection than the fourth amendment. The State urges that, under the "limited lockstep" doctrine, we should not find that article I, section 6, of the Illinois Constitution affords greater protection to citizens than the analogous language of the fourth amendment. For the following reasons, we disagree. Even under the limited lockstep doctrine, we conclude that the Illinois Constitution provides greater protection than the fourth amendment in circumstances such as this case.

¶ 69                            The Limited Lockstep Doctrine

¶ 70    "Under our limited lockstep doctrine, we construe the search and seizure clause of our state constitution in accordance with the United States Supreme Court's interpretation of the fourth amendment unless any of the narrow exceptions to lockstep apply." *People v. Holmes*, 2017 IL 120407, ¶ 24. The doctrine is " 'based on the premise that the drafters of the 1970 constitution and the delegates *** intended the phrase "search and seizure" in the state document to mean, in general, what the same phrase means in the federal constitution.' " *Id.* (quoting *People v. Caballes*, 221 Ill. 2d 282, 314 (2006)).

¶ 71    In its brief and at oral argument, the State contended that the limited lockstep doctrine, as described in *Caballes*, precludes us from interpreting article I, section 6, to provide more protection

than the fourth amendment. We disagree. *Caballes* reaffirmed the limited lockstep doctrine but recognized that, in some circumstances, Illinois courts may interpret the state constitution differently from the federal constitution.

¶ 72    In explaining the history of the doctrine, *Caballes* recognized that the search and seizure provision of the Illinois Constitution of 1870 was "clearly modeled upon the fourth amendment to the United States Constitution." *Caballes*, 221 Ill. 2d at 290-91. The 1870 Constitution provided:

> "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and *no warrant shall issue without probable cause, supported by affidavit*, particularly describing the place to be searched, and the persons or things to be seized." (Emphasis added.) Ill. Const. 1870, art. II, § 6.

¶ 73    In *Caballes*, our supreme court stated:

> "The phrase 'supported by affidavit' in the state provision being virtually synonymous with 'by Oath or affirmation' in the fourth amendment, this court repeatedly held that the two constitutions should be construed alike." *Caballes*, 221 Ill. 2d at 291 (citing several Illinois Supreme Court decisions between 1924 and 1961).

Thus, the "lockstep doctrine" was "firmly in place before the adoption of the 1970 constitution." *Id.* at 292.

¶ 74    In *Caballes*, our supreme court identified *People v. Tisler*, 103 Ill. 2d 226 (1984), as the "seminal case on the question of lockstep interpretation of the search and seizure provisions" of

the Illinois Constitution of 1970. *Caballes*, 221 Ill. 2d at 295. In *Tisler*, our supreme court "acknowledged that it was free to construe the state constitution differently from the federal constitution [citation] and formulated a test for determining when the state constitution need not be interpreted in lockstep with the federal constitution." *Caballes*, 221 Ill. 2d at 297. Under that test:

> " 'Any variance between the [United States] Supreme Court's construction of the provisions of the fourth amendment in the Federal Constitution and similar provisions in the Illinois Constitution must be based on *** substantial grounds. We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned.' " *Caballes*, 221 Ill. 2d at 297 (quoting *Tisler*, 103 Ill. 2d at 245).

¶ 75    In *Caballes*, our supreme court "reaffirm[ed] our commitment to limited lockstep analysis," explaining: "our choice of a rule of decision on matters governed by both the state and federal constitutions *** must continue to be predicated on our best assessment of the intent of the drafters, the delegates, and the voters." *Id.* at 313. In that case, our supreme court applied the doctrine to reject the argument that a police dog sniff should be considered a "search" under the state constitution, reasoning that "[n]othing in the language of article I, section 6 or in the history

of the constitutional debates suggests an intent that the use of trained dogs by the police be considered an unreasonable search or seizure." *Id.* at 315-16.

¶ 76    More recently, in *People v. Fitzpatrick*, 2013 IL 113449, our supreme court explained:

> "As this court noted in *Caballes*, it has done this [limited lockstep] analysis for purposes of article I, section 6, of our state constitution, and determined that the framers intended for it to have the same scope as the fourth amendment. [Citation.] We reaffirmed our commitment to this approach in *Caballes* [citation], so the lockstep question is generally settled for search and seizure purposes.
>
> *Caballes* did note, however, *that our limited lockstep approach would allow for consideration of 'state tradition and values as reflected by long-standing state case precedent.'* " (Emphasis added.) *Fitzpatrick*, 2013 IL 113449, ¶¶ 15-16 (quoting *Caballes*, 221 Ill. 2d at 314).

¶ 77    Thus, "we will construe our constitution as providing greater protection" than the fourth amendment when the following criteria are met:

> "We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned." (Internal quotation marks omitted.) *Fitzpatrick*, 2013 IL 113449, ¶ 15.

¶ 78    Applying this approach in this case, we consider whether there is evidence that the phrase "No warrant shall issue without probable cause, *supported by affidavit*" (Ill. Const. 1970, art. I, § 6) was intended to afford greater protection than its counterpart in the fourth amendment, that "no [w]arrants shall issue, but upon probable cause, supported by *[o]ath or affirmation*." (Emphasis added.) U.S. Const. amend. IV. We find that there is.

¶ 79    Supreme Court Precedent Interpreting the "Affidavit" Requirement of the 1870 Constitution

¶ 80    We note that the "supported by affidavit" phrase was first included in the 1870 Constitution. Ill. Const. 1870, art. II, § 6. The debates of the 1870 Constitutional Convention reflect that the delegates intentionally selected this phrase instead of copying the fourth amendment's "oath or affirmation" phrase. The first version of the Bill of Rights considered by the convention included language that "no warrant shall issue without probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons or things to be seized." Journal of the Constitutional Convention of the State of Illinois, at 664-65 (Apr. 23, 1870), https://babel.hathitrust.org/cgi/pt?id=hvd.li2qkb&view=1up&seq=684&skin=2021 [ [https://perma.cc/K22X-SGYJ]. One of the delegates "moved to amend, by striking out the words 'oath or affirmation,' and insert[ing] the word 'affidavit' in lieu thereof." *Id.* at 772 (statements of Delegate Allen). The convention voted to adopt that amendment. *Id.* at 773.

¶ 81    Subsequent precedent from our supreme court has interpreted this phrase to afford protection greater than the fourth amendment, particularly with respect to the involvement of a neutral magistrate. Our supreme court held in 1898 that the 1870 Constitution's affidavit requirement went "a step beyond" the federal constitution:

> "This section of our constitution is identical with the fourth amendment *** except that it substitutes the word 'affidavit' for 'oath or affirmation.' *It is a step beyond the constitution of the United States, in requiring the evidence of probable cause to be made a permanent record in the form of an affidavit*; otherwise, it is the same." *Lippman v. People*, 175 Ill. 101, 112 (1898).

¶ 82    In *Lippman*, the defendant challenged a statute that allowed a search warrant to be issued when a property owner made an "oath in writing, before any justice of the peace or police magistrate that he has reason to believe" that another person was unlawfully using the owner's casks, barrels, kegs, bottles, or boxes. *Id.* at 110-11. The *Lippman* defendant's premises were searched pursuant to a warrant based on an affidavit by a brewing company agent. *Id.* at 104-05.

¶ 83    In finding the statute unconstitutional, our supreme court repeatedly emphasized the importance of a magistrate, explaining: "The constitutional provisions on this subject had their origin in the abuse of executive authority, and *their design is to substitute judicial discretion for arbitrary power*, so that the security of the citizen in his property shall not be at the mercy of individuals or officers." (Emphasis added.) *Id.* at 112. Our supreme court held: "A search warrant can only be granted *after a showing made before a magistrate*, under oath, that a crime has been committed, and the law, in requiring a showing of probable cause, supported by affidavit, intends that facts shall be stated which shall *satisfy the magistrate that suspicion is well founded*." (Emphases added.) *Id.* at 113. Our supreme court found the statute unconstitutional because it attempted to "transfer the *judicial discretion, which the constitution intended should be exercised by a magistrate*, from that officer to the party making the affidavit." (Emphases added.) *Id.*

¶ 84    While *Lippman* concerned a search warrant, the magistrate's role in determining probable cause is of equal importance in issuing an arrest warrant. Indeed, our supreme court later stated that article II, section 6, of the 1870 Constitution "provides exactly the same protection whether the warrant be for the search of a house and the seizure of property or for the search or seizure of a person." *People v. Elias*, 316 Ill. 376, 382 (1925), *overruled on other grounds by People v. Williams*, 27 Ill. 2d 542, 544 (1963) (recognizing departure from *Elias* in holding that an affidavit based on observations of a person other than the affiant may be sufficient to show probable cause).

¶ 85    In *Elias*, our supreme court again emphasized the necessity of a magistrate:

> "Probable cause does not exist unless the magistrate is convinced *** that there is reasonable ground to suspect that the accused is guilty of the offense charged. [Citation.] The magistrate must exercise his own judgment and not act on the judgment of the official accuser. A warrant issued upon a conclusion of the accuser, without any facts stated in the application upon which the judicial officer to whom it is addressed may form his own conclusion, is not a showing of 'probable cause supported by affidavit,' within the meaning of the [constitutional] guaranty. [Citation.]" *Elias*, 316 Ill. at 381.

Thus, our supreme court has interpreted the "affidavit" language in our state constitution as contemplating the crucial role of a magistrate in the determination of probable cause necessary to issue a warrant.

¶ 86    We also find persuasive a 1930 supreme court decision rejecting a warrantless arrest premised upon a "standing order" by police, which bears some resemblance to the investigative alert at issue here. See *People v. McGurn*, 341 Ill. 632 (1930). The *McGurn* defendant was convicted of carrying a concealed revolver discovered upon his arrest. *Id.* at 634-35. One of the arresting officers testified that he did not see the defendant commit a crime and had no reasonable grounds to suspect defendant of a crime. *Id.* at 634. Rather, he arrested defendant only because a superior officer issued a "standing order" for his arrest. *Id.* at 635. In the course of finding the arrest and search illegal, our supreme court emphasized that there was "nothing about the attending circumstances which would lead a reasonable and prudent man to believe that [defendant] was, in fact, committing any crime or which would justify the officer in making the arrest." *Id.* at 637-38.

¶ 87    Our supreme court in *McGurn* acknowledged that warrantless arrests are sometimes permissible. See *id.* at 636 ("Under the common law constables and watchmen were authorized to arrest felons, and persons reasonably suspected of being felons, without a warrant, and *** had authority to make arrests without warrants in cases of misdemeanors which involved breaches of the peace committed in the presence of the officers making the arrests and which could not be stopped or redressed except by immediate arrest. [Citations.]").

¶ 88    Thus, "[i]t is the rule in this State where a criminal offense has, in fact, been committed, that an officer has a right to arrest without a warrant where he has reasonable ground for believing that the person to be arrested is implicated in the crime. [Citation.]" *Id. McGurn* also recognized that this rule was incorporated by statute. *Id.* ("By paragraph 657 of the Criminal Code [citation] *** an arrest may be made by an officer or by a private person without warrant for a criminal offense committed or attempted in his presence, and by an officer when a criminal offense has, in

fact, been committed and he has reasonable ground for believing that the person to be arrested has committed it.").[3]

¶ 89    Nonetheless, *McGurn* held that an officer who otherwise lacked reason to suspect a crime could not make an arrest based merely on a standing order. Our supreme court explained:

> "The only attempt to justify this illegal arrest is the statement of [the arresting officer] that he was acting under orders of his superior officer, John Stege, commissioner of detectives, to arrest [defendant.] Stege did not have any warrant or process of law for [defendant's] arrest. *** *[U]nder the constitution of this state no municipality has authority to clothe any officer with the autocratic power to order the summary arrest and incarceration of any citizen without warrant or process of law* and thus render the liberty of every one of its citizenry subject to the arbitrary whim of such officer." (Emphasis added.) *Id.* at 638.

The *McGurn* court concluded that defendant's arrest was illegal, and so the trial court should have granted defendant's petition to suppress the revolver as "evidence unlawfully obtained." *Id.* at 646.

¶ 90    In sum, our supreme court precedent interpreting the search and seizure clause of the 1870 Constitution emphasized that an "affidavit" supporting probable cause should be presented to a neutral magistrate before a warrant may issue. A warrantless arrest may be justified where the

---

[3]A similar statutory provision is in effect today. See 725 ILCS 5/107-2(1)(c) (West 2020) (a peace officer may arrest a person when "[h]e has reasonable grounds to believe that the person is committing or has committed an offense").

arresting officer has personal knowledge giving rise to a reasonable ground for believing that the arrestee committed a crime. See *id.* at 636. However, a municipality may not "clothe any officer with the autocratic power to order the summary arrest and incarceration of any citizen without warrant or process of law." *Id.* at 638.

¶ 91         The 1970 Constitution Declined to Change the "Affidavit" Requirement

¶ 92     Although the above case law was decided when the 1870 Constitution was in effect, the drafters of the 1970 Constitution retained the "affidavit" requirement of the search and seizure clause. Article I, section 6, of the 1970 Constitution provides, in relevant part, that "No warrant shall issue without probable cause, *supported by affidavit* particularly describing the place to be searched and the persons or things to be seized." (Emphasis added.) Ill. Const. 1970, art. I, § 6. Presumably, the drafters of the 1970 Constitution were aware of case law interpreting the search and seizure provisions of the 1870 Constitution, including our supreme court's recognition that requiring an affidavit was "a step beyond" the federal constitution. See *Lippman*, 175 Ill. at 112. Had they desired, the drafters could have revised the "affidavit" clause, just as they chose to revise other portions of this section. See *Caballes*, 221 Ill. 2d at 293 (recognizing that article I, section 6, "was substantively changed by inclusion of two new clauses, *** the right to be secure against unreasonable invasions of privacy by the state and the right to be secure against unreasonable interceptions of communications by the state"). The delegates could have opted to replace the "affidavit" requirement with the fourth amendment's "oath and affirmation" phrase or other language, had they wished article I, section 6, to be interpreted identically with the fourth amendment. Instead, they elected to leave intact the requirement that a warrant be supported by an "affidavit," which implicated a magistrate's involvement.

¶ 93    We also do not find any indication that supreme court decisions since the 1970 Constitution overruled its earlier precedent that the identical use of "affidavit" in the 1870 Constitution went a "step beyond" the fourth amendment and calls for the involvement of a magistrate. We recognize that *Caballes* stated that the "supported by affidavit" phrase of the Illinois Constitution was "virtually synonymous with 'by Oath or affirmation' in the fourth amendment." *Caballes*, 221 Ill. 2d at 291. However, *Caballes*—which concerned the wholly unrelated issue of whether a canine sniff implicated the search and seizure clause—did not purport to address the *Lippman* court's explicit statement that the Illinois Constitution's use of the word "affidavit" went a "step beyond" the fourth amendment. *Lippman*, 175 Ill. at 112.

¶ 94    Although no supreme court case has squarely addressed investigative alerts, the arrest in this case resembles the arrest based on a "standing order" that was found unlawful in *McGurn.* In *McGurn*, the arresting officer had no reasonable suspicion that defendant had committed a crime; the sole basis for the arrest was a superior officer's "standing order." *McGurn*, 341 Ill. at 635. In this case, as in *McGurn*, the arresting officer did not observe defendant committing a crime. Nor did the arresting officer have any knowledge of the investigation into Morris's beating, which had occurred approximately six months earlier. The sole basis for his decision to arrest defendant was the investigative alert issued by another detective.

¶ 95    Just as our supreme court invalidated the arrest in *McGurn* premised merely on another officer's "standing order," in this case we cannot condone defendant's arrest premised solely on another officer's investigative alert. Neither involves an "affidavit" submitted to a neutral magistrate. Further, as in *McGurn*, the record does not reflect circumstances that would otherwise justify a warrantless arrest. The arresting officer in this case, Maraffino, admitted (1) that he did

not observe defendant committing a crime and (2) that, other than the investigative alert, he lacked any reason to believe defendant had committed a crime.

¶ 96    Moreover, we emphasize that approximately *six months* elapsed between the issuance of Garcia's investigative alert and defendant's arrest. Clearly, the police could have sought a warrant in that time frame, but the record reflects they simply made no attempt to do so. Indeed, Garcia testified that the police do not attempt to obtain a warrant unless they believe that a suspect has fled the jurisdiction.

¶ 97    One justice of this panel has previously expressed that an investigative alert could be appropriate "when there is probable cause that a suspect has committed a crime and may commit further crimes in the immediate future or is a known flight risk, but that should only be a temporary fix, say, 24 or 48 hours as a maximum." *People v. Pulliam*, 2021 IL App (1st) 200658-U, ¶ 14 (Pucinski, J., specially concurring); *People v. Charles*, 2022 IL App (1st) 210247-U, ¶ 11 (Pucinski, J., specially concurring). Clearly, the facts of the instant case do not present such a situation. Where the Chicago police opt to issue an investigative alert when they clearly had time to seek a warrant, "it threatens the liberty interest of suspects without following the proper foundational requirements of a warrant" and demonstrates their willingness "to take the easy way instead of the constitutionally required way to go about identifying and arresting suspects." *Pulliam*, 2021 IL App (1st) 200658-U, ¶ 15 (Pucinski, J., specially concurring).

¶ 98    We recognize there is no dispute that, under the facts of this case, the results of Garcia's investigation would have provided probable cause to justify a warrant for defendant's arrest, had the matter been properly submitted to a judge. However, that cannot excuse the failure to comply with the constitutional requirement of submitting an "affidavit" to a magistrate. Failure to comply

with the constitution cannot be justified simply because investigative alerts are "easier and faster than getting a warrant" or that detectives feel "warrants are simply too much trouble." *Id.* ¶ 18.

¶ 99    In 2012, Presiding Justice Salone and Justice Neville noted in a special concurrence that their "research has failed to find a constitutional or statutory provision that authorizes the creation or issuance of an investigative alert." *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 40 (Salone, P.J., specially concurring, joined by Neville, J.). In 2020, one justice of this panel noted that there was still no such authority. *Thornton*, 2020 IL App (1st) 170753, ¶ 72 (Pucinski, J., specially concurring) ("It has been eight years since *Hyland*, and I cannot find any authority for investigative alerts under the Illinois Constitution or Illinois statutes either."). We reach the same conclusion today. We thus find that defendant's warrantless arrest, based solely on an investigative alert, violated article I, section 6, of the Illinois Constitution.

¶ 100    Having concluded that the arrest was unconstitutional, we turn to address whether it necessitates reversal and a new trial. Defendant urges that he is entitled to a new trial without the evidence resulting from the illegal arrest, namely defendant's recorded custodial statements, the distinctive jacket defendant wore at the time of his arrest, and Jeffries's identification of defendant in a lineup. The State initially responds that, even if the arrest was illegal, the resulting evidence should not be excluded because the police acted in good faith. See *People v. LeFlore*, 2015 IL 116799 (discussing the good-faith exception to the exclusionary rule). As an alternative to the good-faith exception, the State argues we may affirm because the illegal arrest was "harmless beyond a reasonable doubt." That is, the State urges that the evidence derived from the arrest did not affect the jury's decision to convict, given the additional evidence of guilt.

¶ 101   As explained below, we agree with the State that, because the other evidence of guilt was overwhelming, the admission of evidence derived from defendant's arrest was harmless error. That is, we cannot say the improperly admitted evidence affected the verdict, given the other evidence of guilt. On that basis, we will affirm the conviction, notwithstanding the illegal nature of the arrest. In turn, we need not discuss the potential application of the good-faith exception to the exclusionary rule.

¶ 102        The Admission of Evidence Derived From the Arrest Was Harmless Error

¶ 103   Harmless error review applies where a constitutional violation leads to erroneous admission of evidence. See *In re Brandon P.*, 2014 IL 116653, ¶¶ 48-50 (addressing erroneous admission of child victim's statements in violation of confrontation clause); *People v. Patterson*, 217 Ill. 2d 407, 428 (2005) (addressing erroneous admission of grand jury testimony in violation of confrontation clause). "The test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained at trial." *Brandon P.*, 2014 IL 116653, ¶ 50. "When determining whether an error is harmless, a reviewing court may, '(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence.' " *Id*. (quoting *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008)). "[O]n harmless error review, the question is not what the jury could have done, but what 'the jury *would have* done" absent the improperly admitted evidence. (Emphasis in original.) *People v. Collins*, 2020 IL App (1st) 181746, ¶ 44 (quoting *People v. Parmly*, 117 Ill. 2d 386, 396 (1987)).

¶ 104   In this case, the improperly admitted evidence derived from defendant's arrest consists of (1) the videotaped statements in which defendant admitted to hitting Morris, (2) Jeffries's postarrest lineup identification of defendant, and (3) the jacket that defendant wore on the day of Morris's beating. Defendant argues that such evidence was so crucial to the State's case that its admission cannot be deemed harmless. Specifically, defendant argues that the impact of the videotaped statements was "incalculable," citing *People v. Miller*, 2013 IL App (1st) 110879, ¶ 82 (holding that trial counsel's failure to suppress inculpatory statement met the prejudice prong of the ineffective assistance of counsel standard because " '[a] confession is the most powerful piece of evidence the State can offer, and its effect *** is incalculable' " (quoting *People v. Fillyaw*, 409 Ill. App. 3d 302, 316 (2011))). Defendant also notes that the prosecutor repeatedly referenced defendant's statements in closing argument. With respect to Jeffries's lineup identification, defendant contends that she was the "most critical eyewitness" because she saw "the entirety of the incident and from a much closer vantage point" than other witnesses.[4]

¶ 105   We acknowledge that the evidence derived from the arrest strongly supported the jury's finding of guilt. However, even without that evidence, there was overwhelming evidence of guilt, including multiple witness identifications of defendant. Under this record, we are convinced that the verdict would have been the same, regardless of the evidence obtained from the arrest.

¶ 106   We reiterate that, in determining harmless error, we may "examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction." (Internal quotation marks omitted.) *Brandon P.*, 2014 IL 116653, ¶ 50. That is the situation here. Even

---

[4]Notably, defendant does not suggest that it was improper for Jeffries to testify about what she witnessed, apart from her postarrest identification of defendant. Indeed, the record reflects that Jeffries spoke to police about the incident in April 2014, months before defendant's arrest, although she did not positively identify defendant until after his arrest.

without any of the evidence derived from the October 2014 arrest, the jury heard ample evidence of defendant's guilt. Among that evidence, Lee and Lewis testified consistently that they drove with Morris to a location near a currency exchange, where Morris planned to obtain drugs from defendant. After Morris ran from the currency exchange, Lee and Lewis saw defendant near the alley where Morris was later found. Lee and Lewis separately identified defendant in photo arrays on March 29 and March 30, days after the March 26 beating. Lee and Lewis's testimony about Morris's plan to meet defendant was consistent with video footage from the currency exchange, which Garcia testified showed both Morris and defendant. Independent of Lee and Lewis's account, Jackson testified that she saw defendant hit Morris in the head with a bottle, and she identified defendant in a photo array on April 7. Jackson's account was corroborated by Jeffries's testimony (even without Jeffries's lineup identification of defendant), insofar as Jeffries recalled that she saw a man being kicked and struck in the head with a bottle.

¶ 107   This evidence, none of which was contradicted, was well beyond that necessary to sustain a conviction. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("It remains the firm [conviction] of this court that the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant. [Citations.]"). Given the overwhelming evidence that was properly admitted, we discern no reasonable chance that the jury would have reached a different verdict, even without any of the evidence derived from defendant's arrest. In other words, it "appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *Patterson*, 217 Ill. 2d at 428.

¶ 108   In reaching this conclusion, we recognize the defendant's reliance on the proposition that " 'A confession is the most powerful piece of evidence the State can offer, and its effect *** is

incalculable.' " *Miller*, 2013 IL App (1st) 110879, ¶ 82 (quoting *Fillyaw*, 409 Ill. App. 3d at 316). Defendant also points out that the State's closing argument repeatedly referenced defendant's postarrest statements. We do not doubt the potential impact of a defendant's inculpatory statement in a jury's decision. Certainly, in a case where the evidence is close, the erroneous admission of inculpatory statements will not be harmless, as it could "tip the scales" in causing the jury to convict rather than acquit. See *Collins*, 2020 IL App (1st) 181746, ¶ 32 (in deciding harmless error, "[w]e must determine whether the erroneous admission of hearsay evidence was the weight that tipped the scales against the defendant" (internal quotation marks omitted)).

¶ 109   In this case, however, the evidence was not close. The proof of guilt was overwhelming, *regardless* of defendant's inculpatory statements, Jeffries's lineup identification, or the jacket defendant wore at the time of arrest. Even without that evidence, the jury heard detailed, consistent, and unrebutted testimony from multiple witnesses that squarely pointed to defendant's guilt. We are convinced that the jury would have reached the same verdict, even had it not heard evidence derived from the arrest. Under this record, we agree with the State that the admission of evidence resulting from defendant's arrest was harmless beyond a reasonable doubt. Accordingly, we will not disturb defendant's conviction.

¶ 110   Finally, we briefly respond to the special concurrence, which echoes the *Bass* majority's concerns about needlessly addressing constitutional issues where there is an independent basis on which to resolve the case. *Bass*, 2021 IL 125434, ¶ 30. In *Bass*, the majority could avoid the question of the legality of investigative alerts because it had already reversed the circuit court's judgment on an alternative ground, concerning the duration of the traffic stop. *Id.* ¶¶ 15-27. No such alternative ground exists here—the parties litigated the constitutionality of investigative alerts

in the trial court, and it is the only issue that defendant raises on appeal. Although we ultimately conclude that the use of the investigative alert was harmless error under the record in this case, the harmless error inquiry is implicated only after it is determined that evidence was admitted due to an "error." See *In re Brandon P.*, 2014 IL 116663, ¶ 50 ("The test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained at trial."). That is, we are obligated to address the substantive question of the constitutionality of investigative alerts regardless of whether, under the trial record in this case, the error was "harmless."

¶ 111   In summary, we conclude that defendant's arrest was illegal, insofar as it was a warrantless arrest premised on an investigative alert. However, under the record before us, the admission of evidence derived from the arrest was harmless error, given the other overwhelming evidence of guilt.

¶ 112   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 113   Affirmed.

¶ 114   JUSTICE COGHLAN, specially concurring:

¶ 115   In this case, although I agree that defendant's conviction should be affirmed, I disagree that it is necessary to decide the constitutionality of investigative alerts in order to reach that decision. Accordingly, I respectfully do not join that portion of the majority opinion.

¶ 116   The majority concludes that the arrest was unconstitutional but that the admission of evidence resulting from defendant's arrest was harmless beyond a reasonable doubt. Even without the evidence derived from the arrest, I agree that the evidence of defendant's guilt was overwhelming. I do not agree that the arrest was unconstitutional.

¶ 117   In my view, Sergeant Chris Maraffino's use of an investigative alert to arrest defendant did not violate the Illinois Constitution because it was supported by probable cause. See *People v. Grant*, 2013 IL 112734, ¶ 11 (arrest executed without warrant is valid if supported by probable cause). While Maraffino did not have personal knowledge of the facts underlying this murder investigation, probable cause may be established from the "collective knowledge" of "officers *** working in concert investigating a crime." (Internal quotation marks omitted.) *People v. Moore*, 378 Ill. App. 3d 41, 48 (2007). And even assuming *arguendo* that an arrest based on an investigative alert is unconstitutional, Sergeant Maraffino's conduct in relying on the legal landscape that existed on October 21, 2014, "was objectively reasonable and a reasonable officer had no reason to suspect that his conduct was wrongful under the circumstances." *People v. LeFlore*, 2015 IL 116799, ¶ 31. Whether applying the harmless error doctrine or the good-faith exception to the exclusionary rule, it is possible to decide this case "on nonconstitutional grounds." *People v. Bass*, 2021 IL 125434, ¶ 30.

¶ 118   In arguing that his arrest was unconstitutional, defendant relies on *People v. Bass*, 2019 IL App (1st) 160640, ¶ 71, where a divided panel of this court held that an arrest is unconstitutional when based on an investigative alert. On April 15, 2021, our supreme court vacated those portions of the appellate opinion dealing with "limited lockstep analysis, its application to warrants or investigatory alerts, or the constitutionality of investigative alerts." *Bass*, 2021 IL 125434, ¶ 31. [5]

¶ 119   As this court recently noted in *People v. Moore*, 2021 IL App (1st) 170888-U, ¶ 46 (cited as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)), both

---

[5] *People v. Bass*, 2021 IL 125434, was filed after the dates on which the parties' briefs were filed in this appeal.

"[b]efore and after our supreme court's decision in *Bass*, this court has consistently rejected the constitutional challenge that defendant raises here. *People v. Little*, 2021 IL App (1st) 181984, ¶ 63 (citing *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 39; *People v. Simmons*, 2020 IL App (1st) 170650, ¶¶ 62-64; *People v. Bahena*, 2020 IL App (1st) 180197, ¶¶ 59-64; and *People v. Thornton*, 2020 IL App (1st) 170753, ¶¶ 45-50). We agree with this line of cases that hold that a constitutionally permissible arrest can be made pursuant to an investigative alert as long as the alert is supported by probable cause. *Simmons*, 2020 IL App (1st) 170650, ¶ 64 (quoting *Braswell*, 2019 IL App (1st) 172810, ¶ 39)."

¶ 120    As our supreme court recognized in *Bass*, 2021 IL 125434, ¶ 30, it is a "long-standing rule *** that cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort." See *People v. Butler*, 2021 IL App (1st) 171400, ¶ 56 ("Since we have resolved defendant's arrest issue on other grounds, we need not address his argument that use of the investigative alert by police violates the Illinois Constitution."). I believe that the instant case can and should be resolved on nonconstitutional grounds.

¶ 121    For the foregoing reasons, I concur in the judgment but do not join the majority's analysis on investigative alerts.

*People v. Smith*, 2022 IL App (1st) 190691

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CR-20437; the Hon. Carol M. Howard, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jessica D. Ware, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Brian A. Levitsky, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |