THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WESLEY HARRIS, Defendant-Appellant.

First District (1st Division)    No. 80-1718

Opinion filed June 1, 1981.

James J. Doherty, Public Defender, of Chicago (James L. Rhodes, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Armand Andry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, Wesley Harris (defendant) was convicted on two counts of armed robbery and two counts of armed violence. He was sentenced to 10 years' imprisonment. Defendant appeals.

Carl Carr and Jessie Perry (complainants), employees of B & R Fashions store, on August 31, 1978, testified that at approximately 3:30 p.m. that day two black men entered and asked to see some merchandise. Both men drew handguns and announced a holdup. Perry was forced to open the cash register. One of the two strangers removed the cash. He placed some of the money in his sock. The two then escorted complainants and everyone else in the store into rear dressing rooms and ordered everyone to undress. One of the men took $50 from Perry. Carr was ordered to throw his pants out of the dressing room. The intruders left the store shortly thereafter. Carr testified defendant was not one of the two men.

Carr left the dressing room and observed some men's jackets were missing. He also noted $260 had been removed from his wallet. Several minutes later, police arrived at the store. They escorted Carr to 4826 South Prairie, where he identified the body of James Carbin as one of the two robbers. Carr noted the presence of money in Carbin's sock. He also identified leather jackets found in a nearby automobile as having B & R Fashions price tags on them. Both complainants identified a handgun found on Carbin as having been used in the holdup.

At approximately 3:50 p.m. on that day, Chicago police officers McMahon and Gallivan were driving west on 50th Street in their squad car. They observed a black-over-white Maverick with four men inside come out of an alley onto 50th Street directly in front of them. The car had no State license plates or city vehicle sticker. As the officers attempted to pull the car over, it turned north onto Indiana Avenue and began to slow down. The officers observed the doors of the Maverick open as if the occupants were attempting to exit. The Maverick stopped when it ran into a stop sign.

As the officers approached the Maverick, they heard one of the occupants shout, "The motherfucker is crazy, he has a gun." The officers drew their weapons and ordered the occupants out of the car. The police positioned themselves at the rear of the Maverick, with Officer McMahon on the left and Officer Gallivan on the right. The occupants exited one by one from the passenger side of the Maverick with their backs to McMahon. The first to exit was the occupant of the front passenger seat. The second man to exit was identified as the driver of the car. The man who had been sitting in the rear passenger seat then got out of the car and stated, "That motherfucker is crazy, he has got a gun."

Officer Gallivan testified he was 6 to 8 feet from the men as they appeared. He identified defendant as the driver. Officer McMahon testified that although the men exited the car with their backs to him, at one point they all turned around and faced him. Officer McMahon identified defendant as one of the three men, but was not sure which one defendant was.

The officers testified the fourth man, later identified as James Carbin, climbed over the front seat and onto the floor as if attempting to stuff something under the front seat. Carbin finally came out of the car and proceeded to walk away. As McMahon walked parallel to him, Carbin drew a revolver. McMahon and Carbin exchanged gunfire. Carbin fled, and McMahon followed. Gallivan abandoned the other three occupants of the Maverick and joined in the pursuit of Carbin. McMahon shot and killed Carbin. The handgun identified by the complainants was recovered from Carbin's body. Cash and watches were recovered from Carbin's pockets. Additional cash was found in his sock.

The officers returned to the Maverick and noted the other three passengers had fled. The officers discovered leather coats with price tags on them in the Maverick. The officers also noted a sticker on the car window which indicated defendant was the owner of the Maverick.

At 9 p.m. on August 31, 1978, both officers separately viewed a lineup. Both identified defendant as an occupant of the Maverick. This identification was repeated in open court. On cross-examination, Officer McMahon affirmed that in a police report compiled after the incident but

before the lineup he had described the three other occupants of the Maverick only as three male Negroes of medium build.

Police Investigator John Battistella testified that after the robbery and traffic stop he went to the home of Claudette Brown, defendant's girlfriend. Brown told him defendant was not there and, as far as she knew, defendant's car was parked in back of her house. She said nothing about defendant's car having been stolen.

Defendant's sister, Rosie Wallace, testified for defendant. She stated defendant had dinner at her home at 4 p.m. on August 31, 1978. Defendant left her home at 5 or 5:30 p.m. after his girlfriend called him on the phone. His car was not at Wallace's home on that day.

Claudette Brown also testified for defendant. She stated she had borrowed defendant's Maverick on August 30, 1978, and kept it until 5:30 a.m. on August 31, when she parked it in an alley. At 3:30 p.m. on August 31, she discovered the car was missing. She called police at 3:30 or 4 p.m. The police arrived at about 4:30 p.m., and Brown told them the Maverick had been stolen. She testified that between 5 and 5:30 p.m. she phoned defendant at his mother's home but he was not there. She then called defendant at his sister's home and informed him his car had been stolen. Defendant arrived at her house after the police had been there a second time looking for him. The police had told her defendant's car had been used in a robbery. Defendant called the police, who arrested him at Brown's home at approximately 6 p.m.

Defendant first contends the evidence was insufficient to establish guilt beyond a reasonable doubt. Defendant stresses conflicting testimony by the officers as to the instructions they gave the three men as they exited the Maverick and the failure of the officers accurately to describe defendant in their police report. Such discrepancies, contends defendant, indicate the officers did not actually see defendant and their identification of him is incredible.

■■ We cannot agree. This argument merely raises the question of the credibility of the witnesses. In *People v. Yarbrough* (1977), 67 Ill. 2d 222, 227, 367 N.E.2d 666, the Illinois Supreme Court stated:

> "Conflicts in testimony are certainly not uncommon. The resolution of questions of fact is for the jury. The credibility of witnesses is for the jury to assess, * * *. A court of review will not set aside a jury's verdict unless the evidence presented at trial is so improbable as to raise a reasonable doubt of guilt."

See *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.

In the case before us, the police officers did offer conflicting testimony concerning several details of the incident. However, the officers had the opportunity for a good view of the defendant in the

daytime at a short distance. This is particularly true of Officer Gallivan, who was closest to the men as they exited the Maverick. Both officers were able to identify defendant at a lineup held within five hours after the incident. Although defendant implies the officers may have learned of defendant's name and presence in the lineup before viewing it, the record contains no evidence of any suggestive procedures employed by the police. No motion to suppress the identification was made.

Similarly, the failure of the officers to supply a detailed description of defendant does not invalidate their subsequent identification. It, too, is a matter of credibility of the identifying witnesses to be determined by the trier of fact. See *People v. Pickens* (1978), 63 Ill. App. 3d 857, 863, 380 N.E.2d 868, and the cases therein cited.

Furthermore, the jury "had no obligation to believe defendant's alibi evidence * * *." (*People v. Tennant* (1976), 65 Ill. 2d 401, 412, 358 N.E.2d 1116, *cert. denied* (1977), 431 U.S. 918, 53 L. Ed. 2d 229, 97 S. Ct. 2184.) We therefore cannot say the evidence is "so improbable as to raise a reasonable doubt of guilt" (*Yarbrough*, 67 Ill. 2d 222, 227), and we will not disturb the findings of the jury.

Defendant also argues that because the identification testimony of the police officers is inherently incredible, only the presence of defendant's car at the scene where other evidence was found links defendant to the offense of armed robbery. Therefore, urges defendant, it was error to hold him accountable for the offenses.

We disagree. The Illinois Criminal Code provides in pertinent part (Ill. Rev. Stat. 1977, ch. 38, par. 5—2(c)):

"A person is legally accountable for the conduct of another when:
* * *
(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

The evidence does not establish defendant himself entered B & R Fashions on August 31, 1978, and personally robbed the complainants. However, it is not necessary to prove these facts as a prerequisite to accountability. (See *People v. Tyler* (1979), 78 Ill. 2d 193, 196, 399 N.E.2d 975.) Guilt of commission of a crime on the basis of accountability may be established entirely by circumstantial evidence. *People v. Fletcher* (1978), 72 Ill. 2d 66, 71, 377 N.E.2d 809.

■■ The evidence establishes that only scant moments after the commission of the armed robbery, defendant's car, then being driven by him, was found to contain one of the two armed robbers and the stolen merchandise. There is no evidence defendant attempted at any time to disassociate himself or to withdraw from the entire incident. (See *People v.*

*Hubbard* (1973), 55 Ill. 2d 142, 150, 302 N.E.2d 609, citing Ill. Rev. Stat. 1967, ch. 38, par. 5—2.) Particularly in the absence of any denial, the circumstances here are sufficient to justify the verdict of accountability. This court may not disturb the conclusions reached by the jury. See *Tyler*, 78 Ill. 2d 193, 196-97.

■■ Defendant further urges he was unduly prejudiced by a statement by the prosecutor during closing arguments. The prosecutor stated defendant had been "stripped of any presumption of innocence." Counsel for defendant initially objected to this remark, but subsequently withdrew his objection. Such a failure to object necessarily waives any possible error. (*People v. King* (1977), 66 Ill. 2d 551, 559, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273.) As the jury was instructed by the trial court that the presumption of innocence remained with defendant throughout the trial, we cannot say this remark deprived defendant of a fair trial. (See *People v. Viser* (1975), 62 Ill. 2d 568, 586, 343 N.E.2d 903.) We note the trial judge did not see fit to caution the jury as to this remark, and this court should defer to his judgment, absent any abuse of discretion. See *People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324.

Defendant finally argues the trial court unduly coerced the jury into returning a guilty verdict. After a period of deliberation, the jury informed the trial court it could not reach a verdict. The trial court arranged for overnight housing. The following morning, the foreman sent a note to the trial judge. The message stated, "I believe that this jury is hopelessly deadlocked (11 to 1) and that further discussion would be pointless." The trial judge gave a supplemental instruction to the jury, which continued to deliberate. The jury subsequently found defendant guilty of two counts of armed robbery and two counts of armed violence. Defendant was found not guilty of two counts of unlawful restraint.

Defendant admits the form of the supplemental instruction given the jury by the trial judge was in accordance with the guidelines suggested by the Illinois Supreme Court in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731. Defendant contends, however, that because the supplemental instruction was given after "11 hours of deliberation," the jury was unduly coerced into finding defendant guilty.

We cannot agree. In *People v. Preston* (1979), 76 Ill. 2d 274, 283-84, 391 N.E.2d 359, the supreme court stated:

"In determining how long a jury should be permitted to deliberate before a mistrial is declared and the jury is discharged, no fixed time can be prescribed, and great latitude must be accorded to the trial court in the exercise of its informed discretion. [Citations.] For similar reasons it is primarily the function of the trial court to

determine, on the basis of such factors as the length of time already spent in deliberation and the complexity of the issues before the jury, when the giving of a supplemental instruction becomes appropriate."

■■ The record establishes that deliberations began some time on July 16, 1979, after testimony, closing arguments, and instructions. When the jury could not reach a verdict, the trial judge ordered it to be sequestered for the evening. The trial judge gave the supplemental instruction to the jury shortly after proceedings were resumed on the following morning. The time of deliberation before the supplemental instruction was given was neither unduly long nor unduly short. We, therefore, find no abuse of discretion by the trial court. Furthermore, we note that although the jury did find defendant guilty of armed robbery and armed violence, defendant was found not guilty of unlawful restraint. This, too, mitigates against the allegation that the jury was coerced.

For these reasons, the judgment appealed from is affirmed.

Judgment affirmed.

CAMPBELL, P. J., and McGLOON, J., concur.