2024 IL App (1st) 211102-U

SECOND DIVISION
August 20, 2024

No. 1-21-1102

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 7906 |
| | ) | |
| DEON MATHIS, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County convicting defendant on a theory of accountability for first degree murder and aggravated battery with a firearm is reversed and the cause is remanded for a new trial; the trial court erred in denying defendant's motion to suppress his statements where defendant's waiver of his *Miranda* rights was abated by detectives' false promise of blanket confidentiality of defendant's statements, and the error was not harmless beyond a reasonable doubt; for purposes of retrial, defendant's warrantless arrest was supported by probable cause and did not violate the Illinois constitution.

¶ 2    In October 2002 a jury found defendant, Deon Mathis, guilty of first degree murder of one victim and aggravated battery with a firearm of another victim on a theory of accountability for the actions of his brother, Joseph Mathis. This court affirmed Joseph Mathis's conviction in a separate appeal. *People v. Joseph Mathis*, 2022 IL App (1st) 211027-U. On appeal defendant

raises several errors including the argument the trial court erred when it failed to suppress certain statements defendant made after detectives falsely promised him blanket confidentiality.

¶ 3      For the following reasons, we find the trial court erred when it failed to suppress statements defendant made after detectives made a promise of blanket confidentiality of anything defendant said to police. We find this error was not harmless beyond a reasonable doubt. We also find the properly admitted evidence was sufficient to prove defendant's guilt of the offense charged. Accordingly, we reverse defendant's conviction and remand for a new trial.

¶ 4                                        BACKGROUND

¶ 5      The State's prosecution of defendant Deon Mathis arises from the shooting death of Cometra Hollins and the shooting of Kenneth Edwards by defendant's brother, Joseph Mathis. We recounted the events surrounding the shooting in Joseph Mathis's appeal. *Id*. We begin by briefly summarizing the facts of the shooting and those additional facts necessary to provide context for defendant's appeal.

¶ 6      At approximately 11:00 a.m. on the morning of December 13, 2011, Hollins and Edwards were shot while standing on a street corner. At 11:18 a.m. a person identifying himself as Hollins called 9-1-1 and said that "Joseph" shot him and that he was bleeding. Paramedics transported Hollins to the hospital where he died later that day. Edwards survived and later identified Joseph Mathis as the shooter. Police later learned that defendant was involved in the shooting. On December 26, 2011, another police officer arrested defendant. The officer did not have a warrant but was aware that defendant was a suspect in the shooting in this case. Detectives interrogated defendant over the course of almost two days resulting in an inculpatory statement by defendant.

¶ 7      Defendant filed a motion to quash his arrest and suppress his statements based on the allegedly illegal arrest without a warrant. The following facts were adduced at the hearing on

defendant's motion to quash. On December 15, 2011, following a traffic stop, police arrested Marvin Jackson for possession of cannabis. Jackson informed the arresting officers that he had previously witnessed a murder. Two detectives interviewed Jackson that day. One of the detectives testified that Jackson told the detectives he saw Joseph Mathis in the vicinity of the shooting on December 13, 2011, and tried to speak to him, but Joseph rebuffed him. Jackson saw a gray car with "rims" nearby. The detective testified that Jackson told him the car belonged to defendant, Joseph's brother.

¶ 8    After Jackson tried to speak to Joseph, Jackson went to a local store then drove in the direction of Keeler and Wilcox in Chicago. Jackson saw the same gray car in front of him. The gray car parked near the intersection of Keeler and Wilcox, and Jackson parked several feet behind it, where Jackson sat for several minutes. At some point, Jackson saw Hollins in a group of people approach the intersection. Jackson saw Joseph exit the vehicle, walk toward the intersection, take out a gun, and start firing. Defendant then drove the vehicle to the intersection and opened the passenger door. Joseph got in and defendant drove away. That same day Jackson identified defendant and Joseph as the driver and shooter from photo arrays. The detectives were also aware that the night before the shooting in this case, defendant and Joseph's relative had been killed in the vicinity of this shooting.

¶ 9    The trial court denied defendant's motion to quash arrest and suppress statements. Defendant subsequently filed a separate amended motion to suppress statements on the grounds defendant did not make a knowing and intelligent waiver of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and, regardless, defendant's statement was involuntary. Defendant supported both grounds for relief by arguing that police interrogated defendant for over 38 hours

during which police used coercive tactics, defendant has an IQ below 70, and he has been diagnosed with schizophrenia.

¶ 10   Two experts offered opinions on defendant and the interrogation at the hearing on defendant's motion to suppress. For the defense, Dr. Jean Leska opined defendant was unable to knowingly waive his *Miranda* rights. For the State, Dr. Susan Messina opined defendant was capable of giving a valid waiver of his *Miranda* rights.

¶ 11   The allegedly coercive tactics police employed included repeated interrogations over two days; sleep deprivation due to leaving the lights in the interrogation room on; denying defendant's request to make a phone call; and a false promise allegedly saying that defendant's statements to the detectives would not be shared with anyone else. As to the false promise, after over 38 hours in custody and being subject to repeated interrogations, detectives told police that everything defendant said would stay between the three of them. A detective testified they made that statement in response to defendant's concern that people in defendant's neighborhood would learn defendant gave a statement to police. The detective testified he meant only that no one from the neighborhood would find out, not that the statements would not be used against defendant.

¶ 12   The trial court denied defendant's motion to suppress.

¶ 13   During the *voir dire* of the jury venire, the trial judge asked the potential jurors whether they "agree and accept" each of the *Zehr* principles. See *People v. Zehr*, 103 Ill. 2d 472 (1984). The State concedes the trial judge did not ask any potential jurors whether they "understood" these principles of law.

¶ 14   The trial court tried defendant and Joseph Mathis in simultaneous separate jury trials. Marvin Jackson testified at defendant's trial. Jackson generally testified consistently with the

evidence adduced at the hearing on defendant's motion to suppress. Specifically, Jackson testified that when he went to a local drive through convenience store, he saw defendant driving the gray car with Joseph in the passenger seat. Jackson testified that Joseph usually drove that car. Jackson also testified that after police arrested defendant and Joseph, Jackson identified them both in photos and later in physical lineups. On cross-examination, Jackson added that he had never seen defendant drive before. The gray car was already stopped when Jackson parked his car, and Jackson could not see the driver's face. He did not know if anyone got out of the driver's seat after the car parked. Jackson did, however, have a clear view of defendant driving the car when Jackson was at the convenience store.

¶ 15    The trial court admitted video recordings of defendant's interrogation into evidence. A detective testified that during defendant's interrogation defendant was allowed to sleep and use the washroom and was given food. When not being questioned, defendant laughed at apparently nothing and sang. During questioning defendant initially denied any involvement or knowledge of the shooting.

¶ 16    During the relevant portion of defendant's interrogation that was played for the jury, one of the detectives begins by telling defendant that defendant properly responded to the killing of his cousin (defendant "took care of business"). Defendant's response is unclear. Later, defendant acknowledged the perception of Joseph's role in the shooting in this case. Defendant did not affirmatively agree that Joseph committed the shooting (replying to the detective, "If you say he did."), denied knowing what type of gun was used, and did not affirmatively agree that a gun was even used.

¶ 17    Later, defendant admitted seeing Joseph shoot. The detective told defendant he (the detective) would have done the same thing (shoot those responsible) in response to his own

cousin being shot. Defendant then denied going anywhere with Joseph after the shooting or knowing that Joseph shot anyone. Defendant agreed with the detective that defendant had "heard" that after defendant's cousin was killed the person who killed defendant's cousin was shot and killed. But defendant denied knowing that Joseph shot the person who killed their cousin and three other people (saying, "I don't know about that."). The detective asserted that defendant had already told the detective that information, but defendant denied knowledge of it.

¶ 18    The detective asked defendant why defendant could not tell him what happened. The detective asserted that defendant was afraid of the truth. At this point, the second detective told defendant, "Whatever, it's between him, you and me." The first detective then added, "Listen, *** nobody else will know what the three of us are talking about. We want to understand the facts of what happened. We want to know why other people are talking about something that you did or didn't do. That's why we're trying to get the facts. We know you were there. You seen what happened, but we want your side of the story."

¶ 19    The first detective implored defendant to "just answer the question." The detective told defendant, "You're not the one who pulled the trigger, right?" and defendant responded, "No." The detective said, "Your brother Joe shot the guy, right?" Defendant responded, "He probably did pull the trigger." Later, the detective said, "That's what he was supposed to do, right? That was your plan, wasn't it? To go back and get him right [mentioning defendant's cousin]? *** That's what he's supposed to do right?" Defendant responded, "He's supposed to be a man about it. Own up to the situation." The detective asked defendant to explain it to him and defendant responded, "I can't right now."

¶ 20    The first detective told defendant he never planned for his cousin to be killed but now defendant was in this situation and now he had to do something about it. The detective said,

"You got to do something about it, right?" and defendant could not just let people keep killing people. Defendant responded, "That's right." Then, the detective said they killed his cousin and later, "You got to do something about it, right?" Defendant responded, "Right." The detective said defendant's brother did something about it, he "manned up" and "he took revenge for your cousin's death, right?" Defendant nodded. Then the detective told defendant that defendant was there and saw it. Defendant initially nodded and seemed to say, "Yes sir," but then defendant said, "If you say so." The detective told defendant that defendant did not pull the trigger, Joseph did. Defendant did not respond verbally but nodded in response.

¶ 21     The detective asked how defendant and Joseph left the scene and said they were together and defendant responded, "Yeah." The detective asked if they had seen "Boo" (a nickname for the victim) before defendant got to the corner. Defendant gave an unintelligible response and the detective said, "You just happened to see him?" and defendant nodded in response. The detective said, "Then your brother got out of the car" and defendant again nodded. The detective said, "Then your brother walked up to the guy" to which defendant responded, "Something like that." The detective asked defendant to tell him and asked if that was "how it all went down" to which defendant responded, "Yeah." The detective told defendant that defendant was in the car and defendant responded that he was. Defendant responded "Yeah" to the detective's statement that it was just defendant and Joseph in the car at that time. The detective told defendant "and you pulled up, you were on Keeler, right? Well you had to see the guy on the corner, right?" Defendant said, "Right." The detective said, "Then your brother gets out and tell me what he does." Defendant said, "He shot the dude." The detective said Joseph went back to the car, and defendant responded, "Yeah," and the detective asked if defendant drove away and defendant said, "Yeah." Defendant said he and Joseph went to Joseph's house after the shooting. The

detective asked defendant about his emotions at the time. The detective said, "I would guess that you were happy that you guys got Boo back, right?" Defendant responded, "Right." The second detective said, " You got revenge for you cousin's death, you took care of business, you manned up, right?" Defendant may have responded "You could say the cops could say that." Defendant described Joseph's gun and said that Joseph kept the gun after the shooting.

¶ 22 The detective asked defendant whether he and Joseph were trying to look for "Boo" and defendant responded, "Something like that." When the detective said, "You got to tell me," defendant responded "Yeah." The detective asked if they knew the victim hung out on that corner and defendant responded, "Yeah." Defendant said that was the spot where he always saw him (the victim). Defendant said "Yes" to the question of whether he parked on Keeler. The detectives asked if defendant and Joseph both spotted the victim and defendant said yes. The detectives said Joseph then got out of the car, walked down the street, and defendant saw Joseph "shoot these guys;" then defendant pulled up to the corner, Joseph got back in the car, and defendant drove away. Defendant responded, "Yeah." Then they went back to one of Joseph's residences.

¶ 23 The jury found defendant guilty of first degree murder of Hollins and aggravated battery of Edwards. After trial, defendant filed a motion for a new trial on the grounds (1) the evidence was insufficient to convict, (2) the trial court erred in denying defendant's motion to suppress because defendant's warrantless arrest was without probable cause, and (3) the trial court erred in denying defendant's motion to suppress his statement. The trial court denied defendant's posttrial motion. The court sentenced defendant to 22 years' imprisonment for first degree murder and a consecutive term of 8 years' imprisonment for aggravated battery.

¶ 24 This appeal followed.

¶ 25                                         ANALYSIS

¶ 26     Defendant was convicted on the theory of accountability.

"Section 5-2(c) of the Criminal Code of 1961 provides that a person is legally accountable for the criminal conduct of another if '[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he [or she] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.' 720 ILCS 5/5-2(c) (West 2008)." *People v. Fernandez*, 2014 IL 115527, ¶ 13.

¶ 27     Defendant raises several issues on appeal:

(1) the evidence is insufficient to prove him guilty beyond a reasonable doubt of the offenses charged by accountability; specifically that the evidence is insufficient to prove defendant, "either before or during the commission of [the] offense, and with the intent to promote or facilitate that commission, *** solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2 (West 2000) (When accountability exists);

(2) the trial court erred in refusing to suppress defendant's statement to police because defendant did not knowingly and intelligently waive his *Miranda* rights and, regardless, any waiver of his *Miranda* rights was not voluntary;

(3) the trial court erred in refusing to suppress defendant's statement to police because defendant's statement was not voluntary;

(4) the trial court erred in refusing to quash defendant's warrantless arrest and suppress defendant's statements because police lacked probable cause for the arrest and the arrest violated the Illinois constitution where police had time to seek a warrant but did not; and

(5) the trial court committed plain error when it failed to comply with the requirements of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire* requiring reversal of his conviction and remand for a new trial.

¶ 28                          MOTION TO SUPPRESS STATEMENTS

¶ 29    We first address defendant's argument the trial court erred in refusing to suppress defendant's statement to police because this issue is dispositive of the case. Defendant argues he did not knowingly and intelligently waive his *Miranda* rights; any waiver of his *Miranda* rights was not voluntary; and, regardless, defendant's statement was not voluntary because it was induced by a false promise. We agree with defendant and find defendant's waiver of his *Miranda* rights was not voluntary (or, more specifically, that the voluntariness of his waiver was overborne), requiring suppression of defendant's inculpatory statements to police.[1]

> "Suppression motions generally present 'mixed questions of law and fact,' to which we apply [a] bifurcated standard of review ***. [Citations.]
>
> We review the trial court's findings of 'historical fact' under the deferential manifest-weight standard. [Citations.]
>
> But we review *de novo* the trial court's determination regarding the ultimate ground for suppression raised in the motion." *People v. Leanos*, 2023 IL App (1st) 191079, ¶ 31.

---

[1]    Defendant challenged the voluntariness of his statement outside the context of the *Miranda* rule. In this context this is most likely a distinction without a difference. See *People v. Leanos*, 2023 IL App (1st) 191079, ¶ 62. We specifically hold that the detectives' interrogation vitiated the voluntariness of defendant's waiver of his *Miranda* rights and, therefore, his statements must be suppressed.

¶ 30    In pertinent part, defendant argues that he did not knowingly waive his *Miranda* rights and his statement to police was not voluntary because police lied to him and told him that anything he said would stay between them. Defendant argues this was a promise that his statements would not be used against him and the promise was false because the State introduced defendant's statements at trial. Defendant argues "this kind of false promise is impermissible and renders a statement involuntary." Defendant asserts he had not made any inculpatory statements prior to the false promise by police because prior to that false promise, when police made affirmative statements as to what they believed happened and tried to get defendant to agree, defendant responded either that he did not know or effectively "If you say so." "[I]t will be the State's burden to show that the *Miranda* waiver remained effective, notwithstanding the false promise of confidentiality." *Leanos*, 2023 IL App (1st) 191079, ¶ 61.

¶ 31    The State concedes that at the hearing on defendant's motion to suppress one of the detectives admitted he told defendant that what defendant said would stay between them.

¶ 32    Prior to the promise of confidentiality being made, defendant placed himself at the scene of the shooting and stated he saw his brother shoot the victims. However, defendant did not say he knew his brother was planning to shoot the victims. After the promise of confidentiality was made by the detectives, defendant agreed he and his brother were looking for the victim and that he was happy the victim was dead.

¶ 33    The parties disputed the meaning of the promise. The detective claimed that defendant was concerned that people from defendant's neighborhood would learn defendant spoke to police; and the detective only intended his statement to mean that the detective would not tell people in the neighborhood that defendant made a statement, not that the statement would not be used against defendant in court. The State argues the detective's explanation "is that his limited

promise of keeping defendant's statement from those in the neighborhood, outside the criminal process, was not a blanket promise of confidentiality ***."

¶ 34    Defendant argues the videotaped statement shows that defendant "never said that he was afraid of anyone in the neighborhood finding out, and the detectives promised that *no one* would find out, not that they would not tell people in the neighborhood. The State does not refute that claim. In its brief to this court, the State admits "A clip of the interview was played where [the detective] could be heard saying the conversation would stay between defendant and the two detectives, and during that clip, defendant did not mention being in fear of the neighborhood." Nonetheless, the State argues that even if defendant construed the detectives' statement as a blanket promise of confidentiality, "suppression is warranted only when, in fact, [the] blanket promise of confidentiality induced [defendant's] incriminating statement." (Internal quotation marks omitted.) See *Leanos*, 2023 IL App (1st) 191079, ¶ 55.

¶ 35    The State argues that in this case, "[w]hile defendant made his statement shortly after [the detectives' promise,] the record does not show that defendant confessed because of the detective's statement." The State fails to offer any facts in support of that claim and only asserts in conclusory fashion that the record "demonstrates that *** [defendant's] statement was not induced by a promise of confidentiality."[2] Alternatively, the State argues any error in the

---

[2]    The State also asserts in support that defendant understood *Miranda*. We note, however, defendant's *Miranda* waiver may have been involuntary whether or not defendant initially understood and validly waived his *Miranda* rights. "[A] waiver that is initially valid can be vitiated by police conduct later in the interrogation." *Leanos*, 2023 IL App (1st) 191079, ¶¶ 50-51. The State's arguments do not

admission of defendant's statement was harmless beyond a reasonable doubt. In support of its claim any error was harmless, the State asserts that defendant's statement did not contribute to his finding of guilt. The State argues that defendant's statement was "substantively minimal. *** Defendant's statement consisted mostly of responses to the detectives' questions; while some were 'yes,' most were as vague as, 'if you say so,' or even, 'I can't tell you if he did.' " The State admits defendant did not provide a narrative of events, "and when asked for details, he got some wrong." On the other hand, the State argues, Jackson made a positive and reliable identification of defendant at the crime scene, and defendant's "intent to aid his brother can reasonably be inferred from the surrounding circumstances."

¶ 36     This court recently addressed an issue of first impression in Illinois: "under what circumstances, if any, does a promise of confidentiality render a *Miranda* waiver invalid?" *Leanos*, 2023 IL App (1st) 191079, ¶ 37. Similarly to this case, in *Leanos*, detectives told the defendant, " 'What you tell us is stayin' in here,' and 'What you say here, stays here with us right now.' " *Leanos*, 2023 IL App (1st) 191079, ¶ 3. The court's analysis began by distinguishing a "blanket promise of confidentiality" from "a limited promise that the police will not disclose the suspect's statements or identity to particular people outside of the criminal process." *Id*. ¶¶ 38-39. The former represents "an assurance that a suspect's statements during a custodial interrogation will be held in confidence by the police for all purposes—most notably that the suspect's statement will *not* be used against him in a criminal proceeding." *Id*. ¶ 38. This court found that:

_____

address whether the voluntariness of defendant's *Miranda* waiver, assuming it was voluntary, was overcome by the detectives' false promise. Therefore, we find the State's arguments inapposite.

> "[W]hen a *blanket* promise of confidentiality induces a statement from a suspect that is later used against him at his criminal trial *** the police *** turn the unwitting suspect into a witness against himself by undermining the procedural safeguards or prophylactic measures that *Miranda* put in place to protect the suspect's fifth amendment right against self-incrimination." *Id.* ¶ 40 (citing *Miranda*, 384 U.S. at 439, *Dickerson v. United States*, 530 U.S. 428, 450-51 (2000) (Scalia, J., dissenting, joined by Thomas, J.)).

Stated differently, "a blanket promise of confidentiality blatantly contradicts the second [*Miranda* warning:] 'the explanation that anything said can and will be used against the individual in court.' [Citation.]" *Id.* ¶ 41. "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not *voluntarily* waive his privilege." *Leanos*, 2023 IL App (1st) 191079, ¶ 47 (quoting *Miranda*, 384 U.S. at 476).

¶ 37    Finally, this court suggested that if an officer even *implies* a blanket promise of confidentiality, "the officer should promptly correct the misstatement by telling the suspect that any incriminating statements he makes can and will be used against him—ideally, by re-administering a fresh round of *Miranda* warnings." *Leanos*, 2023 IL App (1st) 191079, ¶¶ 60, 83 ("Even telling someone that he is not considered a suspect (as the detectives did here, in so many words) does not dispel an otherwise reasonable impression, created by police assurances, that any statements he makes will not put him in legal jeopardy."). Nonetheless, "suppression is warranted only when, in fact, a false, blanket promise of confidentiality induced the suspect's incriminating statement." *Leanos*, 2023 IL App (1st) 191079, ¶ 55.

¶ 38    The *Leanos* court rejected the argument, similar to that raised in this case, that the detective was merely promising that detectives would not let other gang members know the defendant was speaking to police. This court found:

> "the detective's intentions or subjective meanings are not the point. '[T]he state of mind of the police is irrelevant to the question of the intelligence and voluntariness of a *Miranda* waiver, unless that state of mind is made manifest in words or conduct that affect the suspect's understanding of his rights. [Citation.]
>
> For purposes of the *Miranda* rule, '[c]oercion is determined from the perspective of the suspect.' *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). *** Thus, in determining whether a promise of confidentiality was made, 'our focus is not on what the detective intended, but rather on what a layperson in [the defendant's] position would have understood those words to mean.' [Citations.]"
>
> *Leanos*, 2023 IL App (1st) 191079, ¶¶ 66-67.

In other words, we take an objective view of the detective's words. *Id*. ¶ 68.

¶ 39    The *Leanos* court held, and in this case we agree with the conclusion that:

> "However these assurances were *intended*, they could have been reasonably understood as promises of confidentiality—blanket assurances that defendant's statements would be held in confidence by the police and not used against him in a criminal proceeding. Promises of confidentiality squarely contradict the *Miranda* warnings." (Emphasis added.) *Id*. ¶ 4.

Ultimately, this court did not suppress the defendant's statements in *Leanos* because the "assurances were far attenuated from [the] defendant's confession and not remotely responsible for it." *Id*. ¶ 5. That is not true in this case.

¶ 40    First, the State does not argue, and the recording does not reveal, anything that suggests detectives did anything to "dispel the impression that defendant's statements would not be used against him." See *id*. ¶ 88. The context in which defendant confessed was the same context of the interrogation before the promise was made. That was the detectives attempting to get defendant to agree to their narrative of how and why the shooting occurred. Because there was no change in the context of the interrogation, it is more likely the promise induced defendant's confession. Compare *id*. ¶¶ 90-92 (discussing context of interrogation and concluding context changed ("[t]he interrogation took an accusatorial turn"), and, therefore, finding "no basis for attributing the confession to a supposedly mistaken belief, induced *** by [the detective's] assurances").

¶ 41    Second, "[a] confession is more likely to be induced by a promise of confidentiality when it follows '[i]mmediately after' ([citations]) the assurance is offered." *Leanos*, 2023 IL App (1st) 191079, ¶ 89. This case involves "an incriminating statement made in direct and immediate response to a promise of confidentiality." *Id*. ¶ 57. Defendant made incriminating statements shortly after the detectives' false promise. Within minutes of the false promise of blanket confidentiality defendant admitted those who killed others had to be retaliated against; that defendant and Joseph were looking for Hollins (Boo), the man who killed their cousin; that defendant and Joseph saw the man who killed their cousin before Joseph exited the vehicle; that Joseph shot that man; that defendant assisted Joseph in fleeing the shooting by pulling up where Joseph re-entered the vehicle; and that defendant was pleased they had killed the person who killed their cousin. *Supra*, ¶¶ 15-22. Before the promise was made, defendant had persistently denied involvement in, or at least knowledge about, the shooting. It is reasonable to conclude that in this case defendant's confession was caused by the detectives' false promise.

¶ 42    Moreover, the detectives' statement to defendant was not "limited or qualified" in the way the State argues (to mean only that the information would not be shared with the neighborhood). Instead, we find that the statement by the detectives "sounds like [an] unqualified promise that 'anything [defendant] said would stay in the interrogation room.' [Citation.]" See *Leanos*, 2023 IL App (1st) 191079, ¶ 70 (and cases cited therein). The detectives were not responding directly to defendant's fear that people in his neighborhood would learn defendant spoke to police; defendant never outwardly expressed such a fear. Compare *Leanos*, 2023 IL App (1st) 191079, ¶ 77 (citing *United States v. Santacruz*, No. 1:21-cr-00304-LMM-JEM-1, 2022 WL 4554420, at *2 (N.E. Ga. Sept. 29, 2022)). In *Santacruz*, the defendant told officers "You know what happens when you have too much to say," so "I just want this to stay here ok ***?" (Internal quotation marks omitted.) *Id*.

¶ 43    Here, even if detectives subjectively perceived some reluctance by defendant to talk, there was no overt expression of the alleged fear on which the State relies. *Id*. ¶ 81. This court reasoned that the detective

> "may have *presumed* that defendant harbored an unspoken fear of gang retaliation *** and may have intended his statement to refer only to confidentiality as to fellow [gang members.] But as we have explained, the detective's subjective thoughts and intentions are not relevant, unless he expressed them verbally to defendant. [Citation.] Unlike in *Santacruz*, there are no fears or concerns voiced by defendant, and no other tangible, observable features of the context, that clearly reveal the assurances to be something other than promises of confidentiality." *Leanos*, 2023 IL App (1st) 191079, ¶ 81.

¶ 44    Here, as in *Leanos*, "the assurances offered can reasonably be understood, at least on their face, as promises of [blanket] confidentiality" in violation of the *Miranda* rule. *Leanos*, 2023 IL App (1st) 191079, ¶ 74. Because we find that the false promise of blanket confidentiality induced defendant's inculpatory statements, we also find that the State failed to meet its "burden to show that the *Miranda* waiver remained effective." See *Leanos*, 2023 IL App (1st) 191079, ¶¶ 59-61. Therefore, defendant's statement, after the promise was made, should not have been admitted. *Leanos*, 2023 IL App (1st) 191079, ¶ 47 (quoting *Miranda*, 384 U.S. at 476).

¶ 45    However, "[t]he improper admission of a defendant's statements is indeed subject to harmless error review. [Citation.]" *People v. Cox*, 2023 IL App (1st) 170761, ¶¶ 55-56.

> "The critical question under harmless error analysis is 'whether it appears beyond a reasonable doubt that the error did not contribute to the verdict.' [Citations.] The admission of unlawfully obtained confessions is 'rarely harmless error.' [Citation.] '[I]n determining whether a constitutional error is harmless beyond a reasonable doubt, "[t]he focus should *** be upon the character and quality of the illegally obtained evidence as it relates to the other evidence bearing on the same issue and the court should appraise the possible impact upon the jury of the wrongfully obtained evidence." ' [Citations.]" *Cox*, 2023 IL App (1st) 170761, ¶¶ 55-56 (citing *People v. R.C.*, 108 Ill. 2d 349, 355 (1985) (quoting *People v. Black*, 52 Ill. 2d 544, 555 (1972))).

¶ 46    Our supreme court has also instructed that, "this court listed three different approaches for measuring error under this harmless-constitutional-error test: (1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether

the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. [Citations.]" *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). The State bears the burden to prove the error was harmless. *Id.*

¶ 47    Applying the foregoing tests in this case, we cannot say the trial court's error was harmless beyond a reasonable doubt. To convict defendant, the State had to prove, and the jury had to find, that defendant was legally accountable for Joesph's actions. The Illinois accountability statute reads as follows:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) either *before or during* the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." (Emphasis added.) 720 ILCS 5/5-2 (West 2000).

The statute also provides that "[m]ere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." 720 ILCS 5/5-2 (West 2000).

¶ 48    This court has held that "under the Illinois accountability statute, the State may prove a defendant's intent to promote or facilitate an offense by showing either (1) that the defendant shared the criminal intent of the principal, *or* (2) that there was a common criminal design." *People v. Petrov*, 2023 IL App (1st) 160498, ¶ 74. "In cases where accountability is premised on shared intent, the appropriate focus is on what the defendant knew about the principle's criminal

intentions, as one cannot share an intent to promote or facilitate the commission of a crime when one does not know that a crime is going to be committed." *Id*. ¶ 75. However, "[u]nlike the shared-intent theory, under the common-design theory of accountability, the State does not need to prove that the defendant and the principal shared the same intent concerning the charged crime. [Citation.] Rather, the State only needs to prove that the defendant had the specific intent to promote or facilitate *a* crime." (Emphasis in original and internal quotation marks omitted.) *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 66.

¶ 49    "[A] person generally will not be deemed accountable for acquiescing to the criminal activities of another." *People v. Taylor*, 186 Ill. 2d 439, 446 (1999). Nor is "being an accessory after the fact *** a crime in Illinois." *People v. Clark*, 221 Ill. App. 3d 303, 308 (1991). In *Taylor* the defendant was convicted of aggravated discharge of a firearm after his passenger fired a weapon during a traffic dispute and he drove away from the scene with the shooter. *Taylor*, 186 Ill. 2d at 443-44. Our supreme court held that the evidence was not sufficient to prove accountability where the evidence showed the defendant was merely present during a shooting and then drove the shooter from the scene. *Id*. at 448. Whether one is an accessory after the fact is determined by "the point at which the commission of the offense terminated" and when the defendant obtained knowledge of the offense. See *id*. A defendant cannot be convicted of any criminal behavior prior to the time he or she obtained the mental state of knowledge of the offense. If the offense was completed by the time the defendant obtained knowledge of it, and the defendant aids or abets the offender thereafter, then the defendant "was merely an accessory after the fact and could be at most charged with obstruction of justice." *Id*. The question is whether the defendant *knowingly* aided the primary offender *before* the offense was completed.

*Id*. Finally, "[g]uilt of commission of a crime on the basis of accountability may be established entirely by circumstantial evidence." *People v. Harris*, 96 Ill. App. 3d 970, 974 (1981).

¶ 50    The issue for purposes of the harmless error analysis in this case is whether the wrongfully admitted evidence contributed to the jury's determination that defendant was accountable for Joseph's actions.

¶ 51    We concede that even without defendant's confession the State adduced at least circumstantial evidence of defendant's accountability. Jackson established defendant's presence at the crime and his assisting Joseph to flee the scene. Defendant's mere presence does not make him legally accountable. 720 ILCS 5/5-2 (West 2000). However, Jackson's testimony is *sufficient* to establish defendant's guilt on the basis of accountability (*Harris*, 96 Ill. App. 3d at 974), but the question here is *not* the sufficiency of the evidence but rather whether the error was harmless. See *People v. Dennis*, 181 Ill. 2d 87, 95 (1998). The harmless error test is distinguished from the sufficiency of the evidence test. *People v. Hernandez*, 2012 IL App (1st) 092841, ¶ 67 ("the harmless-error inquiry was, 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' [Citation.] This inquiry is different than that regarding sufficiency of the evidence."). The question we must answer is whether Jackson's testimony is *overwhelming* evidence of defendant's guilt, whether defendant's statements are merely cumulative of Jackson's testimony (*Patterson*, 217 Ill. 2d at 428), or whether defendant's inculpatory statements contributed to the verdict (*Cox*, 2023 IL App (1st) 170761, ¶¶ 55-56).

¶ 52    Jackson's testimony is circumstantial as it pertains to defendant's knowledge about Joseph's intent, whether defendant shared that intent, or whether defendant intended to facilitate Joseph shooting the victims. Several statements that defendant made after the detectives'

promise of confidentiality (*i.e.*, he and his brother were looking for the victim; he is happy the victim is dead; they took care of business) provide evidence of intent that would not otherwise be present and slams the door on defendant's defense that he was not accountable.

¶ 53    Jackson's testimony is not overwhelming evidence defendant knew Joseph intended to shoot Hollins or that defendant intended to facilitate that or any crime. Although the jury could reasonably draw that inference from Jackson's testimony, and it would be sufficient to convict, there are no other facts or circumstances to support those inferences. Nor is defendant's inculpatory statement cumulative of Jackson's testimony. The only other evidence that defendant knew Joseph's intent, shared it, and intended to facilitate it, is defendant's improperly admitted statement to police. Defendant effectively told police he and Joseph went to the scene to seek revenge by shooting the person who killed their cousin, and that, with that knowledge before the shooting, defendant helped Joseph to escape. The only other evidence establishing defendant's accountability was circumstantial. Defendant's statement provided direct evidence of defendant's accountability. Therefore, we cannot say beyond a reasonable doubt that the erroneous admission of defendant's statement did not contribute to the verdict.

¶ 54    Furthermore, focusing on the character and quality of the illegally obtained evidence as it relates to the other evidence bearing on the issue of accountability (*Cox*, 2023 IL App (1st) 170761, ¶¶ 55-56), we find the wrongfully admitted evidence contributed to the verdict. The State argues that defendant's confession was of little substantive value because defendant only agreed with what the detective's proposed. Regardless, the "character and quality" of the illegally obtained evidence was direct evidence of facts establishing defendant's accountability. Defendant's statement provided evidence of the fact defendant knew Josephs's intent, shared it, and intended to facilitate it. The only other evidence bearing on the issue of accountability was

Jackson's testimony, which was entirely circumstantial. Thus, we find that the improperly admitted evidence likely impacted the jury's finding of guilt. We believe that it is not possible to say the admission of defendant's statement did not contribute to the verdict beyond a reasonable doubt.

¶ 55    We find the trial court erred in denying defendant's motion to suppress his statement to police given after detectives made a false promise of blanket confidentiality and that the error was not harmless. As stated above, absent the improperly admitted evidence, Jackson provided sufficient credible circumstantial evidence to establish defendant's guilt. We have considered defendant's arguments that the evidence was insufficient because Jackson was an unreliable witness and find them unpersuasive. As for defendant's arguments concerning the reliability and voluntariness of his statements, we have found the statements were improperly admitted and the error was not harmless. Remand for a new trial is the appropriate remedy for the error in the admission of the illegally obtained evidence. *People v. McKown*, 236 Ill. 2d 278, 311 (2010) ("If the evidence presented at the first trial, including the improperly admitted evidence, would have been sufficient for any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt, retrial is the proper remedy."). We reverse defendant's conviction and remand for a new trial.

¶ 56    When this court reverses a conviction and remands for a new trial, we decline to address any additional issues raised by the defendant that are not likely to recur at trial. *People v. Sevier*, 230 Ill. App. 3d 1071, 1081 (1992) ("Although we have remanded this cause, defendants raise several other issues which we must address at this time. Issues on which we do not comment are unlikely to recur at the new trial."). In this appeal, there are two issues that are likely to recur: the Rule 431(b) error, and the motion to quash arrest and suppress statements based on the

warrantless arrest. Accordingly we will briefly address each. *People v. Harris*, 39 Ill. App. 3d 805, 812 (1976) ("Since defendant may be retried we must also consider his contention that the trial court erred in refusing to suppress his oral statements to police officers.").

¶ 57                              ILLINOIS SUPREME COURT RULE 431(b)

¶ 58    Rule 431(b) reads, in pertinent part, as follows:

"[During *voir dire* the trial court] shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 59    The trial court must ask each potential juror whether they both "understand" and "accept" the four principles set forth in the rule using the specific words "understand" and "accept." *People v. Moon*, 2020 IL App (1st) 170675, ¶ 52, reversed on other grounds, *People v. Moon*, 2022 IL 125959  (citing *People v. Belknap*, 2014 IL 117094, ¶¶ 44-45). The failure to do so is error in itself. *Id.*

¶ 60    In this case, the trial court failed to ask potential jurors whether they understood the *Zehr* principles. The court did not ask potential jurors if they "understood" each principle. Instead, the court only asked potential jurors whether they "agreed" with each principle. Therefore, the trial court did violate the rule and commit error. *Id*. Upon retrial, the trial court must fully comply with Rule 431(b).

¶ 61              MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE

¶ 62    Defendant argues the trial court erred by refusing to quash defendant's warrantless arrest and suppress defendant's statements because police lacked probable cause for the arrest and the arrest violated the Illinois constitution where police had time to seek a warrant but did not. "When reviewing a trial court's ruling on a motion to quash an arrest and suppress evidence, we accord great deference to the trial court's factual findings unless they are against the manifest weight of the evidence, but review *de novo* the legal question of whether suppression is warranted under those facts." *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶ 14 (citing *People v. Hopkins,* 235 Ill. 2d 453, 471 (2009)). "In doing so, we may consider evidence adduced in both the suppression hearing and at trial." *People v. Hood*, 2019 IL App (1st) 162194, ¶ 39 (citing *People v. Richardson*, 234 Ill. 2d 233, 252 (2009)).

¶ 63    Defendant argues police lacked probable cause because there was no indication Jackson was a reliable witness, police did nothing to confirm the reliability of Jackson's statement, and Jackson did not tell police that defendant "had knowledge of Joseph's intentions in advance or that he participated in the planning of the crime." Defendant argues police had only a suspicion that defendant knew Joseph intended to commit the shooting. Defendant contends that to support a finding of probable cause, third party information must bear "some independent indicia of reliability." Defendant suggests indicia of reliability only comes when police independently

verify a substantial part of the information provided. In light of the aforementioned standard of review, defendant concedes this court should presume the truth of the detectives' testimony that Jackson stated he saw defendant driving the car in which Joseph was a passenger before getting out and committing the shooting and arrested defendant on that basis, but, defendant argues that we should conduct our own review of whether those facts provided probable cause to arrest defendant.

¶ 64    In *People v. Jackson*, 2014 IL App (3d) 120239, on which defendant relies, the Third District wrote that:

> "[T]hird-party information, such as Eibeck's, will support a finding of probable cause for a warrantless arrest, regardless of whether the source of the information is an eyewitness or other witness, as long as the information provided by a third party bears some independent indicia of reliability. [Citations.] An indicia of the reliability of information provided by a third party 'exists when the facts learned through a police investigation independently verify a substantial part of the information' provided by the third party. [Citations.]" *People v. Jackson*, 2014 IL App (3d) 120239, ¶ 84 (citing *People v. James,* 118 Ill. 2d 214, 225 (1987)).

¶ 65    In *James*, the appellate court had held than an uncorroborated incriminating statement by a co-offender was insufficient to provide probable cause. *James*, 118 Ill. 2d at 220. Our supreme court found that the lower court in *James*, similarly to defendant in this appeal, believed there exists "a firm principle that uncorroborated statements by an arrestee can *never* constitute probable cause for the arrest of a co-offender." *James*, 118 Ill. 2d at 222. The *James* court rejected that conclusion as an inaccurate statement of the law. *Id*. Instead, the standard is that

"[t]he information relied upon to establish probable cause to arrest must be supported by *some* indicia of reliability" ((Emphasis added.) *James*, 118 Ill. 2d at 222), and the court takes a "totality-of-the-circumstances approach in the determination of probable cause" (*id*. at 223 (citing *Illinois v. Gates*, 462 U.S. 213 (1983))). "[T]his approach permits a balanced assessment of the relative weights of all the various indicia of reliability [(of which there are several)] attendant upon the giving of the probable cause information." *James*, 118 Ill. 2d at 223. "[T]he probable cause determination is a 'commonsense, practical question.' [Citation.]" *James*, 118 Ill. 2d at 225 (citing *Gates*, 462 U.S. at 230).

¶ 66     It is in "the typical 'informant' scenario," in which "an individual about whom little, if anything, is known, provides information to the police which implicates another person" that "an independent showing of reliability is required because of the obvious risk of misrepresentation or outright fabrication." *Id*. (citing *Gates*, 462 U.S. 213). Independent corroboration provides only "further support" for the reliability of the information but is not the *sine qua non* for reliability— the *Jackson* court wrote that "the corroboration lends credence to the remaining *unverified* portion" of the information. (Emphasis added.) *Id*. at 224.

¶ 67     In *James*, the court found that another indicium of reliability was that the witness (a participant in the offense about which he provided information) was in custody and was not "offered any specific inducement of 'deal.' " *Id*. at 224. The court noted that "[i]n such a circumstance, [the witness has] nothing to gain by providing false information for, once the falsehood was discovered, he would have to suffer the consequences of misleading police." *Id*. "As one court put it, a person 'who knows the police are in a position to charge him with a serious crime will not lightly undertake to direct the police down blind alleys.' [Citation.]" *Id*. (citing *United States v. Davis*, 617 F.2d 677  (D.C. Cir. 1979)). Yet another "indicia of

reliability" is where the statements implicating another are "specific and unequivocal." See *James*, 118 Ill. 2d at 222 (partially explaining basis of holding in *Wong Sun v. United States*, 371 U.S. 471 (1963)).

¶ 68     We recognize Jackson and defendant were not co-offenders, but, as demonstrated above, that is not dispositive. We find that what is dispositive is that Jackson provided police with specific and unequivocal information about defendant, Jackson was in custody for another offense, and Jackson was not offered any specific inducement or "deal" to provide information about the shooting such that, had police believed Jackson misled them, Jackson would have suffered the consequences in his own case. Upon a "balanced assessment of the relative weights of all the various indicia of reliability" (*James*, 118 Ill. 2d at 223) and viewing "the probable cause determination [as] a 'commonsense, practical question,' " (*James*, 118 Ill. 2d at 225), we find that the information Jackson provided police was sufficiently reliable to support finding probable cause.

¶ 69     We also find that substantively Jackson provided sufficient information to support finding probable cause to believe defendant was actively involved in the shooting before or during the commission of the offense and therefore accountable for Joseph's conduct.

> "Probable cause is defined as reasonable ground to believe that the suspect has committed a felony. [Citation.]
>
> ' "Mere suspicion is inadequate to establish probable cause, but the evidence relied upon by the arresting officer need not be sufficient to prove guilt beyond a reasonable doubt or even be admissible at trial. Technical rules do not govern the assessment of whether probable cause existed; rather, practical,

commonsense considerations guide that determination." ' [Citations.]" *People v. Gomez*, 2011 IL App (1st) 092185, ¶¶ 62-63.

The probable cause inquiry "rests primarily on the facts and information known to the arresting officers at the time the search and arrest are made." *People v. Little*, 322 Ill. App. 3d 607, 612 (2001).

¶ 70     As stated above, the circumstantial evidence Jackson provided is reliable and supports a reasonable inference of defendant's active involvement. Jackson saw defendant sitting in the car with Joseph for several minutes before the shooting, Joseph got out and shot the victims, and defendant drove up and carried Joseph away. The evidence supports an inference defendant was waiting with Joseph for the shooting to occur and to then spirit Joseph away. Therefore, the evidence supports a reasonable inference defendant shared Joseph's criminal intent and/or that there was a common criminal design. Therefore, the information was sufficient to lead a reasonable person to believe defendant committed an offense. *People v. Butler*, 2021 IL App (1st) 171400, ¶ 41 ("Probable cause exists when the facts and circumstances known to the officer at the time of the arrest lead a reasonable person 'to believe that an offense had been committed and that the offense was committed by the person arrested.' "). We find police had sufficient probable cause to arrest defendant.

¶ 71     Next, defendant argues his arrest violated the Illinois constitution because "police had time to get an arrest warrant but failed to do so." Defendant relies primarily on the reasoning of *People v. Bass*, 2019 IL App (1st) 160640, finding "investigative alerts" used by the Chicago Police Department violate the Illinois constitution. See also *People v. Smith*, 2022 IL App (1st) 190691. Defendant likens his arrest to an arrest pursuant to an "investigative alert" because no warrant issued and nothing indicated the arresting officer had personal knowledge of Jackson's

statement (and thus, we surmise defendant to argue, the arresting officer must have relied on a *de facto* "investigative alert" by the detectives who took Jackson's statement).

¶ 72    "A defendant bears the initial burden of proof in a motion to quash arrest and suppress evidence. [Citation.] Once he shows a *prima facie* case of an unconstitutional arrest, the burden shifts to the State to show his warrantless arrest was based on probable cause. [Citation.] However, the ultimate burden of proof remains with the defendant." *People v. Little*, 2021 IL App (1st) 181984, ¶ 60. "[W]e may affirm the trial court's ruling on any basis supported by the record." *Hood*, 2019 IL App (1st) 162194, ¶ 39.

¶ 73    In *Bass*, 2019 IL App (1st) 160640, the opinion held that an arrest is unconstitutional under the Illinois constitution when it is effectuated on the basis of an investigative alert issued by the Chicago Police Department. *Bass*, 2019 IL App (1st) 160640, ¶ 71. Subsequently, our supreme court vacated those portions of *Bass*, 2019 IL App (1st) 160640, dealing with, *inter alia*, "the constitutionality of investigative alerts." *People v. Bass*, 2021 IL 125434, ¶ 31. "[O]nce an appellate decision has been vacated by our supreme court, it 'carries no precedential weight.' [Citations.]" *People v. Erwin*, 2023 IL App (1st) 200936, ¶ 16 (citing *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 66 (2006)). Despite that rule, after our supreme court vacated the holding at issue, a panel of this court seemingly applied the vacated holding in *Bass*, 2019 IL App (1st) 160640, and held that the "defendant's warrantless arrest was improper, as it was premised solely on an investigative alert issued *six months earlier*, meaning the police had ample opportunity to obtain an arrest warrant but did not do so." (Emphasis in original.) *People v. Smith*, 2022 IL App (1st) 190691, ¶ 66.

¶ 74    The *Smith* court acknowledged our supreme court's judgment in *Bass*, 2021 IL 125434, but claimed that the *reasons* our supreme court vacated the lower court's judgment in *Bass* (to

avoid deciding a moot question and rendering an advisory opinion) were not present in *Smith*, and "a discussion of investigative alerts is necessary to decide [the] defendant's appeal." *Smith*, 2022 IL App (1st) 190691, ¶ 67. After conducting its own analysis of the issue, the *Smith* court concluded that the "defendant's warrantless arrest, based solely on an investigative alert, violated article I, section 6, of the Illinois Constitution." *Smith*, 2022 IL App (1st) 190691, ¶ 99.

¶ 75    Recently, this court declined to "decide whether the holding in *Smith*, which echoed the *Bass* majority's now-vacated holding, was correctly decided" (*People v. Erwin*, 2023 IL App (1st) 200936, ¶ 47) because the good-faith exception to the exclusionary rule would apply in that case (*id.*). "When the police conduct a search or seizure based on an 'objectively reasonable good-faith belief' that it is lawful, the [exclusionary] rule's deterrence rationale has little or no force, and the exclusion of evidence is not warranted." *Erwin*, 2023 IL App (1st) 200936, ¶ 26. The good-faith exception applies to claims under the search-and-seizure clause of the Illinois constitution. *Id.* ¶ 31.

¶ 76    In *Erwin*, the court found that when the petitioner in that case was arrested, "no case from a reviewing court had directly ruled on the legality of investigative alerts *** under our search-and-seizure clause." *Erwin*, 2023 IL App (1st) 200936, ¶ 33. When an investigative alert was relevant to an issue on appeal, "the rule we would apply was that the State could demonstrate probable cause by relying, in whole or in part, on the facts known to the officer(s) who issued the investigative alert." *Erwin*, 2023 IL App (1st) 200936, ¶ 36. "[I]t was [also] settled law that warrantless arrests made in public and based on probable cause do not violate the fourth amendment [or the Illinois constitution,] even when the officers had time to get a warrant before making the arrest." *Id.* ¶ 42. The court concluded:

"The overall legal landscape at the time of petitioner's arrest leaves no doubt that a reasonable officer, striving in good faith to comply with the law, would conclude that a warrantless public arrest, pursuant to an investigative alert, was perfectly legal under both Illinois and federal constitutional law—as long as there was probable cause for the arrest, as is uncontested here." *Erwin*, 2023 IL App (1st) 200936, ¶ 46.

¶ 77    In this case, we reach the same conclusion as the *Erwin* court and affirm the trial court's judgment denying defendant's motion to quash arrest and suppress evidence because we find the good-faith exception applies to defendant's arrest. We have already decided police had probable cause to arrest defendant. At the time of defendant's arrest, a reasonable officer would believe that such an arrest was lawful "based on the facts known to law enforcement as a whole." *Erwin*, 2023 IL App (1st) 200936, ¶ 39. Defendant was arrested in 2011 and *Bass* was decided by the appellate court in 2019. "[T]he constitutionality of investigative alerts was first called into question in 2012 *** in the special concurrence filed in *People v. Hyland*, 2012 IL App (1st) 110966, ¶¶ 38-52." *Erwin*, 2023 IL App (1st) 200936, ¶ 6. But even then, "[t]he *Hyland* concurrence *** stood as a notable objection to a longstanding and judicially tolerated police practice. But because 'the words and ideas expressed in [a] special concurrence' 'do not speak for this court,' it did not change what seemed to be settled law." *Erwin*, 2023 IL App (1st) 200936, ¶ 8.

¶ 78    We hold the trial court did not err in denying defendant's initial motion to quash arrest and suppress statements. Police had probable cause to arrest defendant.

¶ 79    The trial court committed reversible error when it denied defendant's subsequent motion to suppress statements. Accordingly, the trial court's judgment convicting defendant is reversed

and the cause remanded for a new trial. Upon retrial, defendant's statement should not be admitted into evidence because defendant's waiver of his *Miranda* rights was not voluntary, and the trial court must strictly comply with Rule 431(b).

¶ 80                                    CONCLUSION

¶ 81    For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the case remanded for further proceedings not inconsistent with this order.

¶ 82    Reversed and remanded.